803 A.2d 611

WILLIAM SHEPHERD AND RICHARD SAYLOR, PLAINTIFFS–RE-
SPONDENTS, v. HUNTERDON DEVELOPMENTAL CENTER,
MARIO SCLAMA, COTTAGE TRAINING SUPERVISOR AND
IDA GAL, COTTAGE TRAINING SUPERVISOR, DEFENDANTS–
APPELLANTS, AND WILLIAM WALL, SUPERINTENDENT,
LEON CRONCE, ASSISTANT SUPERINTENDENT, ARTHUR
SEARFASS, ASSISTANT SUPERVISOR OF PROFESSIONAL
RESIDENTIAL SERVICES, VINCENT MURANTE, COTTAGE
TRAINING SUPERVISOR AND DONALD STAMBAUGH, COT-
TAGE TRAINING SUPERVISOR, DEFENDANTS.

Argued January 28, 2002—Decided August 7, 2002.

*Cynthia M. Jacob* argued the cause for appellants Mario Sclama and Ida Gal (*Collier, Jacob & Mills*, attorneys; *Ms. Jacob* and *David J. Treibman*, on the briefs).

*Allison E. Accurso*, Assistant Attorney General, argued the cause for appellant Hunterdon Developmental Center (*David N. Samson*, Attorney General of New Jersey, attorney; *Nancy Kaplen*, Assistant Attorney General, of counsel; *Patrick DeAlmeida*, Deputy Attorney General, on the briefs).

*James L. Pfeiffer* argued the cause for respondent (*Pfeiffer & Winegar*, attorneys; *Brian A. Roemersma*, on the briefs).

The opinion of the Court was delivered by

VERNIERO, J.

■ This case arises under the Law Against Discrimination, *N.J.S.A.* 10:5–1 to –49(LAD). The primary issue is whether plaintiffs' claims are barred by the two-year statute of limitations. To resolve that question, the Court is called on to consider an equitable exception to the statute of limitations known as the "continuing violation" doctrine. Under that doctrine, a plaintiff

may pursue a claim for discriminatory conduct if he or she can demonstrate that each asserted act by a defendant is part of a pattern and at least one of those acts occurred within the statutory limitations period. *West v. Philadelphia Elec. Co.*, 45 *F*.3d 744, 754–55 (3d Cir.1995).

The claims here include allegations that defendants had subjected plaintiffs to a hostile work environment by targeting them for strict enforcement of workplace rules. That conduct purportedly was in response to plaintiffs' support of an unrelated lawsuit against defendants. Finding that plaintiffs' allegations did not implicate a continuing violation, the trial court dismissed all claims as untimely. The court identified one act that had occurred within the limitations period, but it concluded that that act was insufficient to sustain a cause of action under the LAD. A divided panel of the Appellate Division reversed. The panel determined that plaintiffs sufficiently established defendants' continuing violation and that some of the acts giving rise to the violation occurred during the relevant limitations period. The panel also upheld plaintiff Richard Saylor's constructive discharge claim.

We now affirm in part and reverse in part. We hold that under the continuing violation doctrine plaintiffs' hostile work environment claims accrued within two years of their Law Division action. We further agree that those claims present material issues of fact such that summary judgment should not have been granted in defendants' favor. However, we disagree with the Appellate Division in respect of Saylor's constructive discharge claim. Although plaintiff filed that individual claim on a timely basis, we hold that no reasonable jury could find in his favor on the facts alleged. As to that claim only, summary judgment remains the proper disposition.

I.

The facts are derived largely from the parties' pleadings, deposition testimony, and other evidence developed during discovery. We will begin by summarizing a previous lawsuit filed by

two of plaintiffs' co-workers that forms the backdrop to the current litigation. We next will describe plaintiffs' claims and the numerous incidents on which they are based, including their respective dates, which are essential to our analysis of the statute of limitations. We consider all facts in a light most favorable to the non-moving parties, in this case plaintiffs. *Brill v. Guardian Life Ins. Co.*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995).

### A.

Hunterdon Developmental Center (HDC) is a State-owned and - operated facility that provides long-term care to physically and mentally handicapped clients, primarily male adults. HDC consists of several "cottages." Each cottage is divided into eight dorms, with four clients residing in each dorm. During the relevant period, William Shepherd and Richard Saylor (collectively, plaintiffs) each worked as a Cottage Training Technician (CTT or technician) in Cottage # 22, which housed a total of thirty-two clients. The clients who resided in Cottage # 22 were severely retarded males, some assaultive or self-abusive, and ranged in age from twenty to sixty-five years old.

Plaintiffs worked the 11 p.m. to 7 a.m. shift with one or two other technicians. As technicians, plaintiffs were responsible for conducting bed checks every thirty minutes to ensure that clients were sleeping well and were not wet or soiled. Other responsibilities included folding laundry and keeping the dorms clean. Mario Sclama and Ida Gal served as plaintiffs' supervisors at all times relevant to this action.

In 1989, plaintiffs' co-workers, Annie Sampson and Donald Greenfield, both African–American, contended that Sclama and Gal, among others, discriminated against them because of race and created a hostile work environment. Plaintiffs outwardly supported Sampson and Greenfield and expressed their displeasure about alleged discrimination in the cottage. For example, they signed a "letter of protest" describing a number of alleged incidents consistent with Sampson's and Greenfield's claims. There

were other occasions when plaintiffs wrote statements to management in furtherance of their co-workers' allegations. The atmosphere in the workplace was tense.

The Sampson–Greenfield lawsuit was tried in the Law Division in Flemington beginning on October 24, 1994. Plaintiffs' letter of protest was used as evidence at the trial, which resulted in favorable verdicts to both co-workers. The jury awarded compensatory damages to Sampson and Greenfield in the amounts of $675,000 and $335,000 respectively, and awarded punitive damages to each of them in the amount of $252,000. The trial ended on December 19, 1994.

### B.

Plaintiffs allege that, at about the time of the Sampson–Greenfield trial, Sclama and Gal began a pattern of ill treatment and ultra-critical supervision. On November 30, 1994, Gal allegedly approached Shepherd after he had returned from a break and said to him, "Mario [Sclama] and I are going to watch everything that you and Mr. Saylor do and we'll write everything down in the office." In addition, Gal told Shepherd "do you know we had to go through the [Sampson–Greenfield] lawsuit and we're being sued and you and Mr. Saylor are to blame for it? And what goes around comes around and you will be sorry for not writing better statements for us concerning the lawsuit." Plaintiffs claim that the supervisor also told Shepherd that he and Saylor "would be sorry for not agreeing with her and Mario concerning the lawsuit problems."

On December 6, 1994, Gal reportedly repeated her "what goes around, comes around" comment loud enough for Saylor to hear after he had arrived for his shift. Plaintiffs allege that Gal twice repeated the comment directly to Shepherd on December 21, 1994, and also told Saylor that "they were going to get rid of everybody on our shift that was there when the [Sampson–Greenfield] trial was going on." During the holiday season in December 1994, Sclama gave presents to the entire staff, except plaintiffs. Plain-

tiffs also claim that they were not invited to the Christmas party for shift employees and were treated coldly by Sclama and Gal.

At about the same time, Shepherd took one day of sick leave. Shortly after the New Year he was placed on extended "medical verification" status for an alleged pattern of absences. That status meant that HDC's management believed that Shepherd had abused his sick time, requiring him to obtain a doctor's verification of all future illnesses. In accordance with union procedures, Shepherd filed a grievance concerning the medical verification status. After a February 3, 1995, grievance hearing, the medical verification status was lifted. The only other occasion when Shepherd had been placed on medical verification status occurred during the original discrimination incidents involving Sampson and Greenfield.

Shepherd further alleges that on December 30, 1994, Sclama was "hostile all night and acted like he was very mad at me and did not talk to me all night, but he talked to C.T.T. Fred Lancaster [another co-worker in Cottage # 22] and was very friendly with him." In the same vein, Shepherd states that on January 12, 1995, Sclama was "unfriendly all night to me and Mr. Saylor, but was very friendly to everybody else .... He made it obvious that he was mad at me and Mr. Saylor." Saylor alleges similar treatment by Sclama and Gal.

Shepherd testified at his deposition that "[i]t wasn't like it used to be [before the Sampson–Greenfield trial]. We [Sclama and Shepherd] would talk—generally discuss general things while you're working with your co-workers, daily occurrences or sports or whatever. Nothing like that was said at all ... nothing but nasty looks[.]" Shepherd also asserted that before the trial Sclama and he would discuss baseball and eat together, and Sclama would make dinner for everyone.

Plaintiffs claim that Sclama and Gal began to supervise them more aggressively and "hypercritically." For example, Sclama and Gal allegedly allowed other workers to take extended breaks, but the supervisors continuously reminded plaintiffs about the

need to be on time when returning from their breaks. Plaintiffs assert that on January 19, 1995, Sclama confronted Saylor "about being a minute or two late on his break." A co-worker, Irene Capitulik, observed the tension in Cottage #22 and eventually wrote a letter to Susan Carty, HDC's affirmative action officer, describing the animosity that the supervisors allegedly had shown toward plaintiffs. Capitulik also wrote that, from the start of the Sampson–Greenfield trial, Sclama and Gal attempted to provoke arguments with plaintiffs to get them transferred out of the cottage.

On another evening in January 1995, Shepherd reported to Gal that a patient who had been extremely disruptive needed to be medicated. Ordinarily, a supervisor would call immediately for the medication and try to assist the technician. On this occasion, Shepherd had to wait three hours before the patient received the medication. As a result, Shepherd was forced to deal with an unruly client who was yelling, urinating, and disturbing the other patients. Shepherd believed that Gal deliberately delayed ordering the medication. At his deposition, however, Shepherd conceded that he had "no way of knowing" whether Gal had ordered the medication in a timely fashion.

On February 1, 1995, plaintiffs wrote separate letters to HDCs superintendent, William Wall, detailing the above incidents. Shepherd's letter states, in part:

Please help me and my co-worker, Richard Saylor C.T.T. c–22 [Cottage #22]. We were harassed and retaliated against during the racial problems in cottage 22 back in 1989 and although it died down somewhat during 1992 and 1993, as soon as the court case or lawsuit started in November 1994 in Flemington, the retaliation and harassment and animosity, started all over again, worse than ever. I have been treated very badly by certain supervisors in cottage 22. Starting in the first week in November 1994, C.T.S. [Cottage Training Supervisor] Mario Sclama started acting like he was real angry at me and C.T.T. Saylor. Around the end of November, 1994 there were rumors going around cottage 22 that certain supervisors were saying that, Mr. Wall was mad as hell and that people who wrote statements that did not agree with the supervisors, C.T.S. Gal, C.T.S. Sclama and H.C.T.S. [Head Cottage Training Supervisor] [Thomas] Bruno, etc., concerning the court case in Flemington, would be sorry and would be gotten even with and removed from c–22.

On Nov. 31, 1994[sic] at approximately 1:45 a.m., C.T.S. Ida Gal said to me on the way to my lunch break that Mr. Saylor and myself should have written better statements in their favor concerning the lawsuit and that we were to blame for their court problems, and for being sued. She said, remember, what goes around, comes around, [thats] all I can say, now take your lunch break.

She made this goes around, comes around statement several times during the next few weeks, in my presence and Mr. [Saylor's], and also in the presence of C.T.T. Irene Capitulik c–22.

On another night of Dec. 6, 1994 at approximately 11:00 p.m. at the change of shift, after spending several days in court in Flemington, C.T.S. Ida Gal and C.T.S. Mario Sclama were talking in the office and C.T.T. Richard Saylor said that C.T.S. Gal said real loud so Mr. Saylor could hear it, what goes around, comes around, right Mario!

I have written many of these incidents down, times and dates, as I was told . . . to protect myself and Mr. Saylor. I kept notes from Nov. 1994 thru Jan. 1995.

Mr. Wall, C.T.S. Mario Sclama has been the worst of all, he has treated Mr. Saylor and myself with obvious animosity and scorn. When he speaks to Mr. Saylor or me, which is seldom, he always has a nasty look on his face. He treats our coworkers C.T.T. Fred Lancaster and C.T.T. Irene Capitulik real nice. They have both been in cottage 22 about one year. Irene said to me that she doesn't like [what's] going on and that C.T.S. Sclama should not be treating me and Mr. Saylor so badly. C.T.S. Sclama talks to Lancaster and Capitulik a lot and tells them to take extra coffee breaks. He and Ida Gal, sometimes help them fold their clients clothes at night, and help them with their other work and they treat me and Mr. Saylor like outcasts. C.T.S. Sclama is cold and unfriendly to me and Mr. Saylor every night, and in Mario's presence C.T.S. Ida Gal is the same way.

When Mario is off and Ida is in charge alone she isn't as bad. When she is around Mario, she backs him up one hundred percent. Mario makes most of the decisions and she always goes along with what he says. This is the worst I've ever been treated in my whole life. I had to call out sick several times in the past year because of the stress and tension in cottage 22. My blood pressure has been running on the high side and my Doctor told me I have hypertension attributed to stress.

I have been having frequent headaches at work and at home. About the [Sampson–Greenfield] lawsuit in Flemington and the statements that we had to write, Mr. Saylor and I told the truth about everything. It should never have gone that far. It could and should have been settled in cottage 22, but it wasn't. Mr. Sclama has been arrogant and nasty and H.C.T.S. Bruno seems to always back him up. Most of the direct care [technicians] in cottage 22 do not like C.T.S. Mario Sclama, and that's [putting] it mildly, but they are afraid to complain for the threat of being removed from the cottage as a troublemaker.

. . . .

Please help us. Sometimes we feel like there is no hope left in this situation and I can't believe this is really happening to Mr. Saylor and myself. Also I've been

told that retaliation from the court case is against the law. Please help us, don't let this go any further than it has already.

## Saylor's letter to Wall states, in part:

I have been working at H.D.C. for almost eleven years. I have always liked working here and I like the clients in cottage # 22. My co-worker Mr. Bill Shepherd (CTT) and I have been under a lot of stress lately because of the case in court in Flemington N.J.

It started back in 1989 when Ms. Sampson and Mr. Greenfield worked in cottage # 22. Mr. Mario Sclama (CTS) came to C–22 from C–12. He came here acting like [an] army storm trooper. Walking around like a dictator trying to [cause] trouble and it seemed he was good at [it.]

The harassment seemed to have died [down] for a while after Mr. Greenfield and Ms. Sampson were transferred out of [Cottage # 22.]

But it started all over again in . . . 1994 and got worse after the court [case] was over in Flemington N.J.

For example on Dec. 6, 1994 at [around] 11:00 p.m. at the start[ ] of my shift [in] c-# 22, while the court case was still going on[,] I heard Ida Gal (CTS) say to Mario Sclama (CTS) in a loud voice [for] my benefit[,] *"What goes around comes around* [.]*"* Right Mario. I told my co-worker Mr. Shepherd (CTT) about it [and] he wrote it down. Also (CTS) Mario [Sclama] picks at me for being a few minutes late on my break and he doesnt say anything to (CTT) Fred Lancaster or (CTT) Irene Capitulik when they are late returning from their breaks. (I am submitting a statement to you that I wrote to Mr. Bruno (HCTS) concerning the [memos] from Mr. Sclama.) It seems he is just trying to harass[ ] me.

Mr. Sclama (CTS) always seems to talk [in] a nasty tone of voice to Mr. Shepherd (CTT) and myself. But he goes out of his way to be real nice to the other two direct care [technicians] (Lancaster and Capitulik) at all [times.] Mrs. Ida Gal (CTS) acts with animosity [toward] Mr. Shepherd (CTT) and myself but when Mario (CTS) is not around she seems to treat us better. It seems Mr. Sclama . . . intimidates Mrs. Gal (CTS). I know she will never admit[ ] to it. It seems Mr. Sclama (CTS) does anything he wants and gets away with it.

. . . .

I hope writing this statement [to] you will not mean Mr. Shepherd (CTT) [and] myself may be moved to another cottage. . . . The problem is not Mr. Shepherd or myself. Mr. Shepherd and [I] worked in cottage # 22 a long time before Mr. Sclama or Mrs. Gal came to C-# 22 and we [had] no problem [ ] then.

In response to those letters, the superintendent called a shift meeting on February 9, 1995. He later scheduled a counseling session for the shift on March 15, 1995. Plaintiffs did not attend the counseling session, however, claiming that they became aware of the meeting only the day before, on March 14, 1995, and that it

conflicted with their schedules. Specifically, Shepherd stated that he could not attend because he had a conflicting appointment to drop off his car at a garage and had a "bad head cold." Saylor's asserted reason for not attending was that he would be "out of town." The atmosphere in the cottage remained unchanged.

Plaintiffs allege that on February 3, 1995, Sclama insisted that Shepherd give a particular client a shower in the middle of the night after the client had urinated in bed. As a result of the shower, the client became violent, screamed and yelled, and caused much disturbance in the dorm room and to the staff. Shepherd claims that he was "always told not to shower this client in the middle of the night, because [the client would then become] violent, self abusive and destructive in his dorm room and [would be] a threat to staff and peers." Shepherd asserts that Sclama had given those exact instructions to the staff at a previous shift meeting. Shepherd alleges that Sclama purposely created that disruptive situation to upset him.

Plaintiffs further allege that on February 10, 1995, Sclama and Gal, along with a housekeeper, William Cordes, were laughing and talking about a newspaper article regarding the Sampson–Greenfield discrimination case. Plaintiffs claim that the supervisors were speaking loud enough for them to hear. Cordes allegedly remarked that Sampson and Greenfield would not get "a penny of money." They all laughed and Sclama said, "and some of them might have to go to jail before this is over." Plaintiffs assert that those comments were meant to harass them.

Additionally, Cordes allegedly informed plaintiffs that "some supervisors told him it wasnt too late for [plaintiffs] to write statements saying that [they] were wrong about what happened in cottage 22." Cordes also told plaintiffs that he had heard from certain supervisors that the superintendent "was mad as hell," and that people who had written statements adverse to their supervisors would be transferred. Plaintiffs allege that Sclama and Gal were behind Cordes' comments in view of their close relationship with the housekeeper.

On February 27, 1995, after allegedly experiencing hostility from Sclama, Shepherd went home sick because "his nerves were bad" and he "felt sick [to his] stomach." Shepherd testified that Sclama was "unfriendly and nasty looking all night to me [and] did not talk to me at all[.]" Around late February or early March, Shepherd requested to be transferred to another cottage. In reacting to that request, Gal allegedly remarked, "we were going to get rid of you[ ] anyway."

On March 2, 1995, Shepherd filed a discrimination complaint with the New Jersey Department of Human Services (DHS). On the complaint form, he listed the dates on which the discriminatory activities allegedly occurred, November 30, 1994, through and including February 27, 1995. (Although only Shepherd signed the form, it also refers to Saylor and appears to have been filed on behalf of both employees.) On March 3, 1995, Sclama charged Saylor with using inappropriate language in front of clients. Saylor denied the allegation, and no disciplinary action was taken. On March 18, 1995, Shepherd transferred out of Cottage # 22 as he had requested. About that same time, in mid-March, Saylor applied for retirement effective August 1, 1995.

On April 5, 1995, HDC brought disciplinary charges against Saylor for allegedly referring to Sclama as a "god-damn guinea" and "fucking W.O.P." After a hearing, the charges were dismissed based on the hearing officer's conclusion that the supervisors had failed to corroborate the testimony of the one witness who allegedly had overheard Saylor's remarks. (Saylor had received a three-day suspension in 1990 on similar charges after admitting that he had stated to a former supervisor that the supervisor was the type of person who would have sexual intercourse with his "own mother.")

On April 19, 1995, an assistant supervisor sent Saylor "a letter of caution" regarding an alleged "patterning of sick leave usage" by Saylor. The letter stated, "[i]n an effort to be fair to residents and co-workers and to correct a problem which affects our ability to provide adequate care and training to our residents, it is

strongly recommended that you make every effort to report for duty as scheduled." The letter further stated, "[y]our record of attendance will continue to be observed and, should no improvement be noted, you will be required to submit acceptable medical verification for each absence due to illness."

After Shepherd had transferred to a different cottage and Saylor had retired, they each received a letter in response to their previous complaint to DHS. The letter to Shepherd informed him that DHS found no probable cause to support his charge that HDC had taken action against him for his participation in matters leading to the Sampson–Greenfield trial. The letter to Saylor similarly found that Saylor's charge was unsubstantiated. Plaintiffs appealed to the New Jersey Department of Personnel, which, in turn, concluded that the matter was moot because Shepherd had transferred out of Cottage #22 and Saylor had retired.

## C.

On February 27, 1997, plaintiffs filed a complaint in the Law Division against HDC, Sclama, and Gal (collectively, defendants) and other supervisors, claiming hostile work environment, retaliation, constructive discharge, negligent supervision, and conspiracy in violation of the LAD. More specifically, plaintiffs allege that they had suffered ongoing acts of intimidation, harassment, and retaliation by defendants because plaintiffs had given their support to their co-workers in the former Sampson–Greenfield case. The complaint, however, does not describe with specificity the alleged improper acts. Instead, it more generally asserts that impermissible conduct occurred "from 1989 until March 18, 1995" in respect of Shepherd, and "from November, 1984 [sic] to August 1, 1995" in respect of Saylor.

The trial court granted summary judgment in favor of defendants and the other supervisors named in the complaint, dismissing plaintiffs' entire action. The court rejected plaintiffs' argument that the alleged discriminatory acts constituted a continuing violation that allowed plaintiffs to include claims outside the two-

year limitations period. In addition, the court found that no violation occurred within the limitations period to which the prior acts could be linked. The court determined that the last act of alleged harassment and retaliation against Saylor occurred on February 10, 1995. Because plaintiffs' complaint was filed on February 27, 1997, the court concluded that all of Saylor's claims, including his constructive discharge claim, were time barred.

In respect of Shepherd, the court identified one alleged incident that occurred within the limitations period. As noted, on February 27, 1995, Shepherd had gone home sick because Sclama was "unfriendly and nasty looking all night to [Shepherd and] did not talk to [Shepherd] at all[.]" The court concluded that that incident was not actionable as a hostile work environment or retaliation claim under the LAD. Similarly, the trial court dismissed plaintiffs' claims for conspiracy and negligent supervision.

In a reported decision, the Appellate Division affirmed the trial court's dismissal of Shepherd's retaliation claim that had been based on the allegation that defendants forced Shepherd to transfer out of Cottage # 22. *Shepherd v. Hunterdon Dev. Ctr.*, 336 *N.J.Super.* 395, 428, 765 *A.*2d 217 (2001). The panel also upheld the dismissal of plaintiffs' claims for conspiracy and negligent supervision, and the dismissal of their remaining claims against all parties other than HDC, Sclama, and Gal. *Ibid.* With one member dissenting, the panel reversed the trial court's dismissal of plaintiffs' hostile work environment claims and Saylor's constructive discharge claim against HDC, Sclama, and Gal. *Ibid.* The panel remanded the matter for trial in respect of those three defendants. *Ibid.*

Defendants appealed to this Court as of right pursuant to *Rule* 2:2–1(a)(2). Shepherd's retaliation claim and plaintiffs' claims for conspiracy and negligent supervision are not before us because no party has appealed the dismissal of those claims.

## II.

The statute of limitations for claims arising under the LAD is two years. *Montells v. Haynes*, 133 *N.J.* 282, 292, 627

A.2d 654 (1993). The continuing violation doctrine provides an exception to that limitations period. Seemingly straightforward in design, the doctrine is not always straightforward in its application. See Thelma A. Crivens, *The Continuing Violation Theory and Systemic Discrimination: In Search of a Judicial Standard for Timely Filing,* 41 *Vand. L.Rev.* 1171, 1172 (1988) (stating that continuing violation theory is "considered to be one of the most confusing theories in employment discrimination law").

In *Wilson v. Wal–Mart Stores,* this Court recognized the continuing violation doctrine in a LAD case. 158 *N.J.* 263, 272–74, 729 *A.*2d 1006 (1999). We observed that "a significant number of courts recognize that the cumulative effect of a series of discriminatory or harassing events represents a single cause of action[.]" *Id.* at 273, 729 *A.*2d 1006. The Court stated as a general rule that "[w]hen an individual is subject to a continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases." *Id.* at 272, 729 *A.*2d 1006; *see also Ali v. Rutgers,* 166 *N.J.* 280, 286, 765 *A.*2d 714 (2000) (reaffirming "existing jurisprudence" as articulated in *Wilson*).

The United States Supreme Court's recent decision in *National Railroad Passenger Corp. v. Morgan,* —— U.S. ——, 122 *S.Ct.* 2061, 153 *L.Ed.*2d 106 (2002), is consistent with *Wilson's* formulation. The employee in *Morgan* sued his employer under Title VII of the federal Civil Rights Act of 1964, "alleging that he had been subjected to discrete discriminatory and retaliatory acts and had experienced a racially hostile work environment throughout his employment." *Id.,* —— U.S. at —— – ——, 122 *S.Ct.* at 2067–68, 153 *L.Ed.*2d at 116. The Court summarized the employee's claims:

> Such discrimination, [the employee] alleges, began when the company hired him in August 1990 as an electrician helper, rather than as an electrician. Subsequent alleged racially motivated discriminatory acts included a termination for refusing to follow orders, [the employer's] refusal to allow him to participate in an apprenticeship program, numerous "written counselings" for absenteeism, as well as the use of racial epithets against him by his managers.
>
> [*Id.,* —— U.S. at —— n. 1, 122 *S.Ct.* at 2068 n. 1, 153 *L.Ed.*2d at 117 n. 1.]

Title VII's statute of limitations requires that an aggrieved party "file a charge with the Equal Employment Opportunity Commission (EEOC) either 180 or 300 days 'after the alleged unlawful employment practice occurred.'" *Id.* at —— *U.S.* at ——, 122 *S.Ct.* at 2068, 153 *L.Ed.*2d at 117 (quoting 42 *U.S.C.* 2000e–5(e)(1)). The employee in *Morgan* filed charges against the employer in early 1995, over four years from the date of the first alleged discriminatory act. *Ibid.*

In analyzing the limitations question, the Court differentiated between "discrete" discriminatory acts and hostile work environment claims. *Id.,* —— *U.S.* at ——, 122 *S.Ct.* at 2070, 153 *L.Ed.*2d at 120. The Court explained that some discrete acts, "such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify." *Id.,* —— *U.S.* at ——, 122 *S.Ct.* at 2073, 153 *L.Ed.*2d at 122. "Each [such] incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Ibid.* (quoting 42 *U.S.C.* 2000e–5(e)(1)). The Court further indicated that a "discrete retaliatory or discriminatory act 'occur[s]' on the day that it 'happen[s].'" *Id.,* —— *U.S.* at ——, 122 *S.Ct.* at 2070, 153 *L.Ed.*2d at 122. Thus, an employee under Title VII "must file a charge within 180 or 300 days of the date of the [discrete] act or lose the ability to recover for it." *Id.* at —— *U.S.* at ——, 122 *S.Ct.* at 2071, 153 *L.Ed.*2d at 120.

In a critical passage, the Court explained the distinction between a hostile work environment claim and a claim based on a discrete act:

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative affect of individual acts.
>
> . . . .
>
> In determining whether an actionable hostile work environment claim exists, we look to "all the circumstances," including "the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ... A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." ... It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

That act need not, however, be the last act. As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring. Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole. [*Id.* at —— *U.S.* at ——–——, 122 *S.Ct.* at 2073–74, 153 *L.Ed.*2d at 123–25 (internal citations and footnotes omitted).]

The employer in *Morgan* had argued for a more limited application of the continuing violation doctrine. More specifically, the employer had contended that recovery for out-of-time acts "should be available only in hostile environment cases where the plaintiff reasonably did not know such conduct was discriminatory or where the discriminatory nature of such conduct is recognized as discriminatory only in light of later events." *Id.* at —— *U.S.* at 124 n. 11, 122 *S.Ct.* at 2074 n. 11, 153 *L.Ed.*2d at —— n. 11. In explicitly rejecting that argument, the Court indicated that "other avenues of relief are available to employers." *Ibid.* As examples, the Court cited equitable defenses such as waiver, estoppel, or laches that would apply "when a plaintiff unreasonably delays in filing a charge." *Id.* at —— *U.S.* at ——–——, 122 *S.Ct.* at 2076–77, 153 *L.Ed.*2d at 127.

III.

A.

Preliminarily, we must determine whether to apply *Morgan's* analytical framework when evaluating a state cause of action under the LAD. We have noted previously that in resolving disputes under our State employment-law jurisprudence, federal case law is merely a guide. See *Alderiso v. Med. Ctr. of Ocean*

*County, Inc.*, 167 *N.J.* 191, 201, 770 *A.*2d 275 (2001) (rejecting federal case law in determining accrual of wrongful discharge claim under New Jersey's Conscientious Employee Protection Act). That said, we consider *Morgan's* formulation of the continuing violation doctrine to be similar to the one advanced in *Wilson*. There also is a benefit in having our State jurisprudence mirror the approach taken in *Morgan* to avoid further confusion in an already complicated area of law. We thus will apply *Morgan's* analytical framework to the present action.

In so doing, we must consider two questions. First, have plaintiffs alleged one or more discrete acts of discriminatory conduct by defendants? If yes, then their cause of action would have accrued on the day on which those individual acts occurred. Second, have plaintiffs alleged a pattern or series of acts, any one of which may not be actionable as a discrete act, but when viewed cumulatively constitute a hostile work environment? If yes, then their cause of action would have accrued on the date on which the last act occurred, notwithstanding "that some of the component acts of the hostile work environment [have fallen] outside the statutory time period." *Morgan, supra,* —— *U.S.* at ——, 122 *S. Ct.* at 2074, 153 *L.Ed.*2d at 124.

■ With the exception of two discrete acts (discussed in Section IV below), there is no serious dispute that the conduct alleged in plaintiffs' complaint was continual in nature and occurred during the period set forth by plaintiffs. Plaintiffs claim that their supervisors subjected them to heightened scrutiny beginning November 30, 1994, and that that conduct, along with the supervisors' "what goes around, comes around" remarks, continued over the ensuing months. Their testimony describes individual incidents common to the same two supervisors and related to the same basic subject, with no one incident constituting a discrete, stand-alone claim.

We conclude that plaintiffs' allegations fall under the hostile-environment rubric as set forth in *Morgan*. Accordingly, plaintiffs' cause of action accrued on the date of the last act in the

pattern or series of acts that comprise the continuing violation claim. In the case of Shepherd, that act occurred on February 27, 1995, when Sclama allegedly treated plaintiff in an "unfriendly and nasty" manner making him "sick [to his] stomach." In the case of Saylor, the last act occurred on April 19, 1995, when an assistant supervisor sent plaintiff "a letter of caution" regarding an alleged "patterning of sick leave usage[.]" Because both acts occurred within two years of plaintiffs' February 27, 1997, Law Division complaint, plaintiffs' respective hostile environment claims are timely.

Defendants urge an opposite conclusion. They contend that plaintiffs were aware of the alleged discrimination no later than February 1, 1995, as reflected in their detailed letters to HDC's superintendent on that date. Under defendants' theory, the two-year statute of limitations expired on February 1, 1997, prior to the filing of plaintiffs' Law Division action. They cite a number of federal decisions, including *Galloway v. General Motors Service Parts Operations*, 78 *F*.3d 1164 (7th Cir.1996), for the proposition that awareness or belief that one has been the victim of discrimination starts the running of the applicable limitations period for a continuing violation claim:

We disagree. We read *Morgan* as holding that a victim's knowledge of a claim is insufficient to start the limitations clock so long as the defendant continues the series of non-discrete acts on which the claim as a whole is based. Indeed, in a hypothetical example involving acts occurring during a 400-day period, the Supreme Court observed that "on day 401 all incidents are still part of the same claim[,]" and it does not "matter that the employee knows on [day 100] that an actionable claim happened[.]" *Morgan, supra*, —— *U.S.* at ——, 122 *S.Ct.* at 2075, 153 *L.Ed.*2d at 125. Moreover, the Court explicitly rejected the contrary test articulated in *Galloway*. *Id.* at —— n. 11, 122 *S.Ct.* at 2074 n. 11, 153 *L.Ed.*2d at 124 n. 11.

Under *Morgan*, a victim's knowledge becomes relevant within the framework of an employer's laches defense. *Id.* at

— – —, 122 *S.Ct.* at 2076–77, 153 *L.Ed.*2d at 127. That defense may bar a plaintiff "from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant." *Id.* at —, 122 *S.Ct.* at 2077, 153 *L.Ed.*2d at 127. We would envision such a defense to be applicable when an aggrieved party, with knowledge of a claim based on non-discrete acts, waits a considerable period before filing suit. See *Borough of Princeton v. Bd. of Chosen Freeholders*, 169 *N.J.* 135, 157–58, 777 *A.*2d 19 (2001) (outlining relevant factors to consider when evaluating laches argument). Here, plaintiffs commenced their Law Division action two years and twenty-six days after their February 1, 1995, letters to the superintendent. We cannot conclude as a matter of law that the filing of plaintiffs' complaint within that time frame is sufficient to implicate a laches defense.

■ More fundamentally, defendants assert in supplemental briefs that *Morgan* does not apply in this setting. They contend that the Supreme Court's rationale in that case turned principally on Title VII's language requiring that an aggrieved party "file a charge with the Equal Employment Opportunity Commission (EEOC) either 180 or 300 days 'after the alleged unlawful employment practice *occurred.*'" *Morgan, supra*, — *U.S.* at —, 122 *S.Ct.* at 2068, 153 *L. Ed.*2d at 117. (quoting 42 *U.S.C.* 2000e–5(e)(1)) (emphasis added). In contrast, *N.J.S.A.* 2A:14–2, which forms the basis of the LAD's limitations window, requires that an action "shall be commenced within 2 years next after the cause of any such action shall have *accrued.*" (Emphasis added). Thus, argue defendants, "[u]nlike 'occur,' the word 'accrue' has no fixed meaning." They further assert that "under New Jersey's 'accrual' statute of limitations, considerations of reason, justice, and equity determine the date the limitations period begins running."

■ Defendants' argument is misplaced. As we noted in *Ali, supra*, another case involving a LAD continuing violation claim, the term "accrual" simply denotes "the date on which the statutory clock begins to run." 166 *N.J.* at 286, 765 *A.*2d 714. Under *Wilson, supra*, that date is the date on which "the wrongful action

ceases." 158 *N.J.* at 272, 729 *A.*2d 1006. Fixing a trigger date at some earlier juncture, as urged by defendants, would alter the very nature of a continuing violation claim. Such a claim, by definition, is comprised of a pattern or series of acts connected for liability purposes by the fact "that an act contributing to the claim occurs within the filing period[.]" *Morgan, supra,* —— *U.S.* at ——, 122 *S.Ct.* at 2074, 153 *L.Ed.*2d at 124. We are persuaded that other than in the case of laches or some other equitable defense, a victim's mere knowledge of a claim is not dispositive.

B.

Having concluded that plaintiffs' claims are timely, we must next consider whether they are sufficient to withstand summary judgment. To establish a cause of action under the LAD based on a hostile work environment, plaintiffs must satisfy each part of a four-part test. Specifically, they must show that the complained-of. conduct (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive. *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 603–04, 626 *A.*2d 445 (1993). Within that framework, a court cannot determine what is "severe or pervasive" conduct without considering whether a reasonable person would believe that the conditions of employment have been altered and that the working environment is hostile. *Id.* at 604, 626 *A.*2d 445. Thus, the second, third, and fourth prongs are, to some degree, interdependent. *Ibid.*

Under the first prong of *Lehmann,* a plaintiff must show by a preponderance of the evidence that the impermissible conduct would not have occurred but for plaintiff's protected status. *Ibid.* Here, plaintiffs contend that they are protected persons under the LAD because they actively supported Sampson and Greenfield in their racial discrimination action. In that respect, the LAD provides that it is unlawful "to coerce, intimidate,

threaten or interfere with any person ... on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act." *N.J.S.A.* 10:5–12d. Because they aided or encouraged Sampson and Greenfield in the exercise of their rights under the LAD, plaintiffs plainly have satisfied *Lehmann's* first prong for purposes of withstanding defendants' summary judgment motion.

Whether plaintiffs have satisfied the second and remaining prongs is a closer question. The following cases outline the contours of the "severe or pervasive" requirement: *Taylor v. Metzger*, 152 *N.J.* 490, 502–03, 706 *A.*2d 685 (1998) (concluding that patently racist slur spoken publicly by supervisor to subordinate created jury question on whether comment was sufficiently severe); *Heitzman v. Monmouth County*, 321 *N.J.Super.* 133, 148, 728 *A.*2d 297 (App.Div.1999) (concluding that anti-Semitic comments did not constitute severe or pervasive conduct because they were casual, sporadic, and did not involve any physical threat); *Leonard v. Metropolitan Life Insurance Co.*, 318 *N.J.Super.* 337, 345, 723 *A.*2d 1007 (App.Div.1999) (concluding that comments about plaintiff's disability uttered by supervisor created genuine issue of material fact on severe or pervasive requirement); *Woods–Pirozzi v. Nabisco Foods*, 290 *N.J.Super.* 252, 270–71, 675 *A.*2d 684 (App.Div.1996) (concluding that jury question existed on "severe or pervasive" requirement in case in which plaintiff alleged that supervisor "frequently" said to her, "you're a woman and a pain in my ass," that supervisor called plaintiff a "loser" about "once or twice a week," and that he said to her "you're so emotional, it must be PMS time" about "twice a month").

Considering those contours here, many of plaintiffs' allegations, standing alone, would be insufficient to state a cause of action. A supervisor's coldness, lack of civility, or failure to provide employees with Christmas gifts or party invitations, although inhospitable and boorish, cannot qualify as "severe or pervasive" conduct under the LAD. See *Shepherd, supra,* 336 *N.J.Super.* at 416, 765 *A.*2d 217 (observing that "[n]either rude-

ness nor lack of sensitivity alone constitutes harassment, and simple teasing, offhand comments, and isolated incidents do not constitute discriminatory changes in the terms and conditions of one's employment"). Similarly, without more, an employer's filing of a disciplinary action cannot form the basis of a LAD complaint. See *Von Gunten v. Maryland*, 243 *F*.3d 858, 869 (4th Cir.2001) (noting that employee who has complained about discrimination does not thereafter obtain "immunity from . . . basic employment policies or . . . disciplinary procedures").

Viewed cumulatively, however, the acts alleged by plaintiffs are sufficient to present a hostile work environment claim to a jury. Perhaps the most troublesome aspect of the supervisors' conduct is the alleged series of "what goes around, comes around" remarks. When stated and then repeated by a supervisor, those types of comments are susceptible to either a benign or nefarious interpretation. But against the backdrop of the Sampson–Greenfield lawsuit, "the conduct starts to look more nefarious than benign." *Shepherd, supra,* 336 *N.J.Super.* at 418, 765 *A*.2d 217. On balance, we agree with the Appellate Division that defendants' remarks and other acts could be seen "to have threatened plaintiffs that they would be more closely supervised and managed than other employees who had not taken the 'wrong' side in the Sampson/Greenfield litigation." *Id.* at 417, 765 *A*.2d 217.

In respect of the third and fourth prongs, the Court in *Lehmann, supra,* adopted an objective standard to exclude an "idiosyncratic response of a hypersensitive plaintiff[.]" 132 *N.J.* at 614, 626 *A*.2d 445. Viewing all facts in a light most favorable to plaintiffs, we cannot conclude that they reacted in a hypersensitive manner to their supervisors' repeated comments, cold treatment, and in the case of Saylor, to the disciplinary charges brought against him. Moreover, that plaintiffs were singled out for such treatment is virtually uncontested. Under those circumstances, we are constrained to conclude that plaintiffs have alleged facts minimally necessary to form a hostile work environment claim sufficient to withstand defendants' motion.

## IV.

### A.

██ What remains to be analyzed are the two discrete acts alleged by plaintiffs. The first involves Shepherd's claim that he suffered an act of retaliation as reflected in his March 18, 1995, transfer to a different cottage. An unwelcome job transfer clearly constitutes a discrete act. See *Morgan, supra,* —— *U.S.* at ——, 122 *S.Ct.* at 2073, 153 *L.Ed.*2d at 122. Because Shepherd filed his complaint within two years of the transfer date, his retaliation claim is timely. The Appellate Division upheld the trial court's dismissal of that claim, not on timeliness grounds, but because the transfer itself "was insufficient to establish an adverse employment decision." *Shepherd, supra,* 336 *N.J.Super.* at 420, 765 *A.*2d 217. Although plaintiff has not appealed that determination and no further analysis is required, we note for guidance that we agree with the Appellate Division's disposition substantially for the reasons stated in that court's opinion. *Id.* at 419–20, 765 *A.*2d 217.

### B.

Saylor's claim of constructive discharge is the second alleged discrete act. We assume without deciding that a constructive discharge claim under the LAD accrues when the employee gives notice of the resignation or retirement. See *Daniels v. Mut. Life Ins. Co.,* 340 *N.J.Super.* 11, 13, 773 *A.*2d 718 (App.Div.) (holding statute of limitations for constructive discharge under Conscientious Employee Protection Act "begins to run on the date that the resignation is tendered"), *certif. denied,* 170 *N.J.* 86, 784 *A.*2d 719 (2001). Saylor applied for early retirement in mid-March 1995, within the applicable limitations period.

██ We do not believe that Saylor has alleged facts sufficient to survive summary judgment in respect of his constructive discharge claim. Generally, a constructive discharge under the LAD occurs when an " 'employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable

person subject to them would resign.'" *Muench v. Township of Haddon*, 255 *N.J.Super.* 288, 302, 605 *A.*2d 242 (App.Div.1992) (quoting *Goss v. Exxon Office Sys. Co.*, 747 *F.*2d 885, 888 (3d Cir.1984)). In addition, specific considerations are relevant to a constructive discharge analysis. In particular,

an employee has the obligation to do what is necessary and reasonable in order to remain employed rather than simply quit. A trial court should consider the nature of the harassment, the closeness of the working relationship between the harasser and the victim, whether the employee resorted to internal grievance procedures, the responsiveness of the employer to the employee's complaints, and all other relevant circumstances.

[*Shepherd, supra*, 336 *N.J.Super.* at 420, 765 *A.*2d 217 (citing *Woods–Pirozzi, supra*, 290 *N.J.Super.* at 276, 675 *A.*2d 684; *T.L. v. Toys 'R' Us, Inc.*, 255 *N.J.Super.* 616, 663, 605 *A.*2d 1125 (App.Div.1992) (Skillman, J.A.D., concurring in part and dissenting in part), *certif. denied*, 130 *N.J.* 19, 611 *A.*2d 657 (1992), *aff'd as modified on other grounds sub nom. Lehmann, supra*, 132 *N.J.* 587, 626 *A.*2d 445).]

There are subtle but discernible differences between the standard for a hostile work environment and the standard for constructive discharge. The hostile work environment claim requires "severe or pervasive" conduct that objectively "alters the conditions of employment" and is "hostile or abusive." Loss of a tangible job benefit is not necessary for a hostile work environment claim because the harassment itself affects the terms of conditions of employment. *Taylor, supra*, 152 *N.J.* at 507, 706 *A.*2d 685.

In contrast, constructive discharge requires not merely "severe or pervasive" conduct, but conduct that is so intolerable that a reasonable person would be forced to resign rather than continue to endure it. *Jones v. Aluminum Shapes, Inc.*, 339 *N.J.Super.* 412, 428, 772 *A.*2d 34 (App.Div.2001). More precisely, the standard envisions a "sense of outrageous, coercive and unconscionable requirements." *Ibid.* Simply put, a constructive discharge claim requires more egregious conduct than that sufficient for a hostile work environment claim. *See, e.g., EEOC v. Univ. of Chicago Hosps.*, 276 *F.*3d 326, 331–32 (7th Cir.2002) (observing that to establish constructive discharge under Title VII plaintiff is required "to demonstrate a discriminary work environment even

more egregious than the high standard for hostile work environment") (internal quotation marks and citation omitted); *Woods v. Delta Beverage Group, Inc.*, 274 *F.*3d 295, 301 (5th Cir.2001) (observing that to establish constructive discharge claim under Title VII plaintiff "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment claim") (internal quotation marks and citation omitted).

Applying those tenets, we are not convinced on the record presented that a reasonable jury could find defendants' conduct to have been so unbearable that it would have forced Saylor's retirement. *Brill, supra,* 142 *N.J.* at 545, 666 *A.*2d 146. That conclusion is consistent with our earlier finding in respect of plaintiffs' hostile work environment claim. Put differently, because Saylor has alleged conduct only "minimally necessary to form a hostile work environment claim," *supra* at 26, 803 *A.*2d at 626 he cannot survive summary judgment under the elevated constructive discharge standard unless he asserts additional facts. Moreover, Saylor did not, in our view, do all that was reasonably necessary to remain employed, an additional consideration in this setting. In fact, Saylor absented himself from a critical counseling session called by the superintendent to discuss the very issues raised by his internal complaint. Lastly, defendants indicate, and plaintiffs do not dispute, that Saylor contemplated retiring more than a year before the Sampson–Greenfield trial. That fact suggests that Saylor intended to retire for reasons other than the complained-of violations. When viewed in a light most favorable to him, Saylor's constructive discharge claim cannot survive summary judgment.

## V.

We affirm all aspects of the Appellate Division's judgment except for that portion pertaining to Saylor's constructive discharge claim. The matter is remanded to the Law Division for further proceedings consistent with this opinion.

ZAZZALI, J., concurring in part and dissenting in part.

I concur in the comprehensive opinion of the Court that plaintiffs' hostile work environment claims are not barred by the statute of limitations under the LAD, and that those claims present material issues of fact for a jury to determine. *Ante* at 17, 803 *A.*2d at 614. However, I cannot join in the majority's conclusion that Saylor did not allege sufficient facts to sustain a claim of constructive discharge. The majority reasons that "because Saylor has alleged conduct only 'minimally necessary to form a hostile work environment claim,' ... he cannot survive summary judgment under the elevated constructive discharge standard unless he asserts additional facts." *Ante* at 29, 803 *A.*2d at 628. In my view, the record, viewed in a light most favorable to the non-moving party, Saylor, reveals a triable issue regarding both hostile work environment and constructive discharge. I therefore respectfully dissent.

I

A constructive discharge occurs under the LAD where an " 'employer knowingly permit[s] conditions of discrimination in employment so intolerable[1] that a reasonable person subject to them would resign.' " *Muench, supra,* 255 *N.J.Super.* at 302, 605 *A.*2d 242 (quoting *Levendos, supra,* 860 *F.*2d at 1231). However, constructive discharge is a "heavily fact-driven determination[.]" *Id.* at 302, 605 *A.*2d 242 (citing *Levendos, supra,* 860 *F.*2d at 1230). "[C]ourts have found constructive discharge based upon a continuous pattern of discriminatory treatment over a period of years[.]"

---

[1] In my view, the "intolerable" standard is too strict. Allegations of difficult and grating working conditions should be sufficient to overcome a motion for summary judgment. *Cf. Bourque v. Powell Electrical Manuf. Co.,* 617 *F.*2d 61, 65 (5th Cir.1980) (rejecting contention that employee must show intolerable working conditions in favor of demonstration of "difficult or unpleasant" working conditions) (quoting *Alicea Rosado v. Garcia Santiago,* 562 *F.*2d 114, 119 (1st Cir.1977)). Although I believe there is a fact question on this record in respect of intolerable conditions, the Fifth Circuit's approach is more in touch with "the realities of modern employment." *Id.* at 65.

*Aman v. Cort Furniture Rental Corp.,* 85 *F.*3d 1074, 1084 (3d
Cir.1996) (citing *Nolan v. Cleland,* 686 *F.*2d 806, 813 (9th Cir.
1982); *Clark v. Marsh,* 665 *F.*2d 1168, 1175–76 (D.C.Cir.1981)).

The concept of constructive discharge is by definition elusive.
The concept generates confusion both in law and in practice.
Because the conduct of the employer is sometimes subtle as it
pressures an employee to quit, there are rarely bright lines or
smoking guns. Therefore, in determining whether conditions
were so intolerable that an employee felt forced to resign, we must
consider the totality of the circumstances, including but not limit-
ed to the frequency or consistency of the allegedly discriminatory
or hostile conduct, its severity, and whether it unreasonably
interfered with the employee's work performance.

## II

In the present matter, the record reveals facts that could
support a jury finding that HDC knowingly permitted conditions
of discrimination so intolerable that Saylor was forced to resign.
Beginning in 1989 and 1990, HDC was aware that Shepherd and
Saylor supported Sampson and Greenfield in their lawsuit. Shep-
herd and Saylor openly expressed their displeasure about racial
discrimination and communication problems with supervisors in
Cottage # 22. Both plaintiffs reported those problems to Sclama
and Gal and several others in HDC's administration.

In November 1994, when Sclama and Gal had to appear in
court, Sclama and Gal began treating plaintiffs with hostility and
engaged in overly-critical supervision of plaintiffs. According to
plaintiffs, Sclama and Gal no longer said hello or goodbye and
used aggressive, nasty, or hostile tones with plaintiffs. However,
Sclama and Gal were friendly and cheerful toward other shift
employees. According to Shepherd, on one occasion Sclama was
"hostile all night and acted like he was very mad at me and did not
talk to me all night, but he talked to CTT Fred Lancaster and was
very friendly with him." On another occasion, Shepherd stated
that Sclama was "unfriendly all night to me and Mr. Saylor, but

was very friendly to everybody else ... [h]e made it obvious that he was mad at me and Mr. Saylor." In addition, around Christmas time, Sclama gave gifts to all of the staff members on the 11:00 p.m. to 7:00 a.m. shift except for Shepherd and Saylor and did not invite plaintiffs to the holiday party for shift employees.

The above conduct may not be reasonably characterized as intolerable, but Sclama and Gal's treatment of plaintiffs was not limited to unfriendly behavior. Sclama and Gal regularly allowed other shift employees to take extra and extended breaks, but consistently reminded Shepherd and Saylor to be on time when returning from their breaks. For example, on January 19, 1995, Sclama angrily confronted Saylor "about being a minute or two late on his break." Sclama's behavior prompted a co-worker, Irene Capitulek, to write a letter to Susan Carty, the Affirmative Action Officer at the HDC, describing the hostility from Sclama and Gal toward Shepherd and Saylor. In the letter, Capitulek stated that since the start of the Sampson–Greenfield trial, the supervisors attempted to provoke arguments among plaintiffs "to get them transferred out of the cottage," thus revealing that an objective bystander discerned animus on the part of defendants.

Sclama and Gal also directly threatened plaintiffs. For example, on November 30, 1994, when Shepherd had returned from his lunch break around 2:00 a.m., Gal threatened him, stating that "[Sclama] and I are going to watch everything you and [Saylor] do and we will write down everything in the office." She also stated "do you know we had to go through the lawsuit and we're being sued and you and Mr. Saylor are to blame for it? And what goes around comes around and you will be sorry for not writing better statements for us concerning the lawsuit." That same day, Gal told Shepherd that he and Saylor "would be sorry for not agreeing with her and [Sclama] concerning the lawsuit problems." Gal repeated her comment that "what goes around comes around," this time loud enough for Saylor to hear after he arrived for his shift, and twice directly to Shepherd a few weeks later.

Also during this time, Shepherd had called in sick and shortly after the New Year he was placed on extended "medical verification" status for an alleged pattern of absences, indicating that management believed he had abused his sick time. Shepherd subsequently filed a grievance with the union and, after a hearing, was removed from medical verification status. Similarly, on April 19, 1995, Searfass issued a "letter of caution" to Saylor in respect of a pattern of sick leave.

In an effort to remedy the situation, on February 1, 1995, plaintiffs each wrote a letter to HDC Superintendent Wall, informing him that the retaliatory harassment in Cottage # 22 had resurfaced and worsened, causing them to suffer emotional stress. In response to the letters, the Superintendent called a shift meeting on February 9, 1995, and scheduled a counseling session on March 15. Both men claimed that the shift meeting was ineffective, and due to the late notice, they were unable to attend the counseling session. They were not given the opportunity to reschedule and the Superintendent never followed up on the matter. Moreover, there was no increase in supervision on the 11:00 p.m. to 7:00 a.m. shift after the February 2 meeting concerning the retaliation and hostile work environment.

On February 10, Sclama, Gal, and the housekeeper, William Cordes, were laughing and talking about an article in The Star Ledger regarding the Sampson–Greenfield trial, loud enough for Shepherd and Saylor to hear. Sclama stated that "some of them might have to go to jail before this is over." Shepherd and Saylor believed that that comment was meant to harass them. They also believed that Sclama was trying to threaten them by insinuating that they would go to jail. Cordes later informed Shepherd and Saylor that "some supervisors had told him it wasn't too late for [them] to write statements saying that [they] were wrong about what happened in Cottage # 22." Cordes also told them that he had heard from certain supervisors that "Mr. Wall was mad as hell" and that people who had written statements adverse to their supervisors would be transferred. Shepherd and Saylor believed

that Sclama and Gal were behind Cordes's comments in view of their close relationship with him.

In March 1995, about the time that Shepherd had transferred out of the cottage, Sclama charged Saylor with using the "F'" word in front of a client. He also alleged that Saylor approached him and told him that another shift employee was "fucking" with his clients. Saylor denied the incident in a memo to Mrs. Stecker, Assistant Supervisor of Residential Living, claiming that the charge was further harassment by Sclama as a result of his support of Greenfield and Sampson. No disciplinary action was taken against Saylor. On April 5, Sclama again charged Saylor for using inappropriate language and ethnic slurs. On June 9, the disciplinary action on appeal was dismissed after the hearing officer concluded that management had failed to meet its burden to show by a preponderance of the evidence that the charge was truthful and accurate.

On March 17, 1995, Saylor filed for retirement. He last worked in July 1995. Saylor retired despite his previous intention to remain at HDC until he was seventy years old. Saylor alleged that his "working condition[s] [were] so intolerable and therefore [he] was forced to retire."

III

In my view, the record indicates that Saylor was not subjected to sporadic and isolated incidents of discrimination or maltreatment, but rather endured pervasive, regular and intentional hostility in the form of overly strict supervision, an absence of social contact, both direct and veiled threats, and apparently unwarranted disciplinary charges. I have detailed above the long history of harassment culminating in the intense period marking the months before Saylor left his employment with the HDC. There is one other consideration that should be evaluated in determining whether the situation was intolerable and that is the horrific work environment in which he worked. To be sure, one can view these facts through the semantic prism of employment law and argue

that a reasonable juror in the workplace would find the situation tolerable. But that crimped view of the landscape ignores the realities of *this* workplace.

Saylor was responsible for thirty-two mentally retarded adult males, some assaultive or self-abusive. He thus coped daily with violent and destructive "clients." In turn, he was buffeted by harassing supervisors who either were seeking his removal, or, at the very least, to make his life—and—work difficult. Pressure from both sides operated on him, synergistically creating the atmosphere that he claims caused him to quit. That is not to say that Saylor enjoys a lower or different burden of proof because of his circumstances. He voluntarily chose to work at HDC. However, the line between tolerable and intolerable is an imprecise one. Submission of the question to the jury to determine whether under the reality of life in Cottage # 22 that line was crossed is consistent with the basic principle that provides the benefit of all inferences to non-moving parties.

Therefore, I would hold that a jury reasonably could conclude that Saylor's decision to retire was based on the cumulative effect of the persistent hostile treatment by his supervisors. The very fact that plaintiff had been subject to continuous discrimination and retaliatory treatment during his employment with HDC is sufficient to support a conclusion that he had simply had enough. Indeed, Capitulek's observation that "Sclama and Gal attempted to provoke argument with plaintiffs to get them transferred out of the cottage," by itself, creates a significant fact question that, if true, evidences not only a constructive discharge but animus as well. Moreover, in a letter to HDC administration regarding the atmosphere in Cottage # 22, Saylor specifically stated that he did not want to transfer to a different cottage. Additionally, in his certification to the trial court Saylor stated that he had planned to work until he was seventy years old, but could not because his "working condition[s] [were] so intolerable [that he] was forced to retire." From the facts alleged a jury could conclude that HDC permitted the conditions of plaintiff's employment to become " 'so

intolerable that a reasonable person subject to them would re-sign.'" *Muench, supra,* 255 *N.J.Super.* at 302, 605 *A.*2d 242 (quoting *Levendos, supra,* 860 *F.*2d at 1231).

As noted by the Appellate Division,

[v]iewing the evidence from Saylor's perspective, his employer discriminated against him over a four-month period by making his working conditions intolerable; there was a close physical working relationship between Saylor and his alleged harassers; Saylor pursued internal grievance procedures to complain about the harassment; and his employer, according to Saylor, half-heartedly responded to these complaints. Also, Saylor claimed that he did not want to voluntarily transfer, as Shepherd did, because he felt there were distinct disadvantages to starting out all over again in a new cottage. Given the conduct of his immediate supervisors, we believe that the reasonableness of Saylor's decision to choose to early retirement was a question of fact to be determined at trial.

[*Shepherd, supra,* 336 *N.J.Super.* at 421–22, 765 *A.*2d 217.]

Therefore, like the Appellate Division, I would allow Saylor's constructive discharge claim to be decided by a jury.

*For affirmance in part; reversal in part*—Chief Justice PORITZ and Justices COLEMAN, VERNIERO and LaVECCHIA—4.

*Concurring in part; dissenting in part*—Justices STEIN, LONG and ZAZZALI—3.