854 A.2d 922 (2004)
371 N.J.Super. 537
Mary SETTINERI, Plaintiff-Appellant,
v.
PNC BANK CORP., now known as PNC Financial Services Group, Inc., PNC Bank, N.A., Leo Ahern, individually and in his official capacity, and Michael Brundage, individually and in his official capacity, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 4, 2004.
Decided July 16, 2004.
*923 Catherine M. Brown argued the cause for appellant.
Jill E. Jachera, Princeton, argued the cause for respondent (Morgan, Lewis & Bockius, attorneys; Keren C. Rabin, on the brief).
Before Judges CIANCIA, PARKER and R.B. COLEMAN.
The opinion of the court was delivered by
PARKER, J.A.D.
After seven days of trial, plaintiff's claims of age discrimination and retaliation under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, and intentional infliction of emotional distress were dismissed by the court. She appeals and we affirm.
Plaintiff was first employed by PNC Bank Corp.'s (PNC) predecessor in 1983. She was promoted to branch manager in Budd Lake and then to Whippany, a larger branch. She performed satisfactorily until 1994 when she was reprimanded for closing her son's home equity loan when it had only been conditionally approved. In March 1996, plaintiff's branch failed an audit and her regional manager, Leo Ahern, evaluated her job performance for 1995-96 as "marginal."
Plaintiff was "very dissatisfied" with Ahern's appraisal and disagreed with his emphasis on the audit failure. According to plaintiff, other branch managers who failed audits did not get marginal reviews, and her branch placed fifth out of the twenty that Ahern supervised. Ahern and Michael Brundage, plaintiff's market level manager, noted, however, that plaintiff failed to correct deficiencies from the failed audit. Brundage agreed with Ahern's decision in "placing the weight on the audit" and noted that plaintiff's "sales and service numbers were on the downturn."
*924 Plaintiff was concerned about losing her job and wanted to transfer out of Ahern's region, but her marginal rating prevented the transfer. Ahern complained that plaintiff did not understand or assume responsibility for the severity of the audit violations, and that she became hostile and made no attempt to work with him. Plaintiff claimed that she talked to Ahern but "didn't get any satisfaction."
Plaintiff then contacted Martha Sellers of human resources, who did an initial investigation of plaintiff's complaint. Sellers found no support for plaintiff's claim that her review was unfair. Plaintiff later complained of age discrimination and after investigation, that claim, too, was found to be unsupported.
In August 1996, plaintiff filed a complaint with the Division on Civil Rights alleging age and gender discrimination. She claimed that she "was not part of [Ahern's] plan" because in 1996 and the beginning of 1997 Ahern hired five men and one woman under age thirty-one as branch managers. In response to plaintiff's civil rights complaint, Brundage wrote a memo "to file" stating that transactions on accounts of plaintiff's family members in 1994 and 1995 constituted a conflict of interest, and that those accounts should be transferred to another office.
In November 1996, plaintiff requested a "step down" to assistant branch manager. The request was not granted. After Ahern evaluated plaintiff's performance as "marginal" again in December 1996, plaintiff renewed her request because she believed that this was the only way to preserve her job. Brundage testified that plaintiff's supervisors "all pretty much agreed that ... she really should stay in Whippany and clean up the audit." She made no attempt to work things out, however, and Ahern testified that he could have fired plaintiff after the two marginal evaluations, but he did not do so.
As a branch manager, plaintiff's salary was $37,000. Her grade had a salary range of $35,400 to $60,300. Plaintiff testified that, from discussions with Brundage and human resources personnel, she understood that her step down would not change her salary or grade. In April 1997, her request for a step down was granted and she accepted the assistant branch manager position in Sparta. After the transfer to Sparta, Ahern no longer had any role in plaintiff's supervision. Plaintiff's salary remained the same, but her new position had a salary range of $25,000 to $41,600. Brundage testified that "it is common knowledge that your salary grade would change" with a move from branch manager to assistant branch manager. According to plaintiff's new supervisor, Barbara Chernes, the pay grade for the assistant manager in the Sparta branch was established before plaintiff transferred to that position. When plaintiff learned of her change in grade level, she contacted human resources and was advised that Brundage refused to revise it.
In June 1997, plaintiff's performance was rated "achieved" and she received a 2.5 percent merit increase in salary. The same month, plaintiff filed a complaint against Brundage with the Division on Civil Rights, alleging age and gender discrimination.
Barbara Chernes, the Sparta branch manager, testified that plaintiff was initially pleased about her transfer. By the fall of 1997, however, her performance level declined. Plaintiff advised Chernes that her grandson was diagnosed with a tumor and she needed time off. After she returned to work, her grandchild needed a bone marrow transplant, and plaintiff told Chernes that the child was likely to die. During that time, plaintiff avoided answering *925 phones and speaking with customers and her job performance suffered.
In December 1997, Chernes wrote to Mary Windeler in human resources, stating that a "severe personal crisis"  treatment of plaintiff's grandson for cancer  needed to be resolved before plaintiff could function as a supervisor. Plaintiff insisted, however, that her grandson's illness did not affect her work.
In May 1998, plaintiff was transferred to the Vernon branch as a result of restructuring within the company. Her job title was branch service manager, which merged the previous titles of branch manager and assistant branch manager. Personnel responsible for the transfer denied knowledge of plaintiff's earlier civil rights complaints. Nevertheless, plaintiff claimed when she transferred to Vernon, it "was going around" that she had filed a complaint, and "[a] lot of people brought it to my attention."
When plaintiff complained about the length of her commute to Vernon, she was advised that, while an employee's commute was a consideration in assignments, up to fifty miles was considered reasonable. Indeed, Chernes's commute increased from twenty-two to fifty miles after the reorganization. Plaintiff was not happy about her transfer to Vernon and advised her regional and sector managers that she wanted to be considered for a position closer to her home.
In June 1998, plaintiff's new manager, Barbara Andres, evaluated her performance as "achieves," and plaintiff obtained another 2.5 percent salary increment.
In October 1998, plaintiff's sector sales manager, Angie Pergentile, gave her an "oral counseling" for opening an account for a family who had overdrawn funds in another bank and who then overdrew $1,200 from the PNC account. Pergentile advised plaintiff that she should have obtained the approval of a senior manager before opening the account and she should have reviewed the cumulative overdraft reports. Plaintiff excused her conduct, claiming she had authority to open the account, that she decided to give this young family a chance, and that the overdrafts occurred while she was on vacation.
The day after the oral counseling, plaintiff took a disability leave of absence extending from October 1998 to January 1999. She maintained that she was suffering from stress, anxiety, depression and sleeplessness caused by the oral counseling, understaffing in her branch, her long commute and her superiors' ignoring her. Plaintiff's two-year-old grandson had died of cancer in March 1998 after a year of treatment, but plaintiff insisted that her disability was due entirely to her work, rather than stress resulting from her grandson's illness and death.
Plaintiff learned of an opening for a branch service manager in Budd Lake, ten minutes from her home, and asked to be considered for it. John Nietzel, the regional service manager, testified that the Budd Lake opening was posted in January 1999, but plaintiff did not contact him about it until March. She was advised that the position was already filled with a new hire.
Plaintiff also contacted her former regional manager about openings and was offered a position in Westfield. She was ineligible for transfer, however, because in January 1999, she had distributed $1,500 from the IRA of her husband, Peter Settineri, without his authorization, and was placed on probation for performing a transaction for a family member in violation of PNC's code of ethics. Plaintiff claimed she "knew nothing about" the policy that she had violated, but acknowledged that the IRA from which she *926 removed funds was not a joint account. Victoria Henn, the highest ranking human resources officer at PNC, testified that she rewrote and clarified this policy in April 1997. PNC distributed it, posted it, and conducted mandatory training on it. Henn testified that there was "no reason" why an employee would not know about it. Henn noted that, after her January 1999 probation, plaintiff would be terminated if she ever performed "this type of transaction again."
In April 1999, PNC commended plaintiff for achieving 130 percent of her branch's goal in sales, the highest in its division. In May 1999, plaintiff's branch passed its audit, and PNC praised her again for the number of loans she booked.
In May 1999, plaintiff attended a training session entitled "Civil Treatment for Managers, Tools for Building A Civil Workplace." Plaintiff testified in her deposition, which was introduced at trial, that she decided to leave PNC after this meeting because "[i]t was hurtful that I had to sit there and listen to all of this garbage." She claimed that she "was getting [so] emotionally upset that my [blood] pressure was so high ... I had to go to the doctor's."
Plaintiff resigned in May 1999 at age 63, after fifteen and one-half years of service. Her blood pressure returned to normal after her resignation, and she later took a bookkeeping job, earning approximately $1,000 per month.
At the close of plaintiff's case, the trial judge granted defendants' motion to dismiss plaintiff's claim for intentional infliction of emotional distress. The remaining claims were dismissed at the close of defendant's case. Plaintiff's motion for a new trial was denied and plaintiff appealed, arguing that the trial court erred in (1) dismissing her claims; (2) denying her motion for a new trial; and (3) excluding evidence of a verdict against Ahern in an LAD lawsuit involving his prior employer.
Plaintiff argues that the judge erred in dismissing her claim for constructive discharge and that the judge improperly invoked the two-year statute to limitations to bar her claims against Ahern and Brundage. She contends that her retaliatory harassment was continuous and not, therefore, subject to the statute of limitations.
The Law Against Discrimination, N.J.S.A. 10:5-12, provides that "[I]t shall be an unlawful employment practice... (d) For any person to take reprisals against any person... because that person has filed a complaint ... under this act...." The judge dismissed the retaliation claims against Ahern and Brundage because the two supervisors were not involved in any of plaintiff's allegedly adverse employment actions within the two-year statute of limitations. Noting that plaintiff had good reviews when she was in Vernon, the judge rejected plaintiff's "domino" theory, that Ahern and Brundage caused later adverse employment actions, which resulted in plaintiff's constructive discharge, since neither Ahern nor Brundage had responsibility for, supervision of or contact with plaintiff within the limitations period.
Plaintiff argues that Shepherd v. Hunterdon Developmental Center, 174 N.J. 1, 803 A.2d 611 (2002), precludes dismissal of her claims against Ahern and Brundage, because the Supreme Court adopted the "continuing violation" doctrine as an equitable exception to the statute of limitations for hostile work environment claims under the LAD. A continuing violation claim, "by definition, is comprised of a pattern or series of acts connected for liability purposes by the fact `that an act contributing to the claim occurred within *927 the filing period.'" Id. at 24, 803 A.2d 611 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 121, 122 S.Ct. 2061, 2074, 153 L.Ed.2d 106, 124 (2002)). Here, neither Ahern nor Brundage committed any act contributing to plaintiff's claim within the two-year statutory period.
With respect to the bank, the judge found nothing "nefarious ... [or] indicating that anybody worked together to provide an intolerable working condition," and concluded "that [no] reasonable juror can find that there was any type of continuous action. The actions have been explained by the witnesses." The judge found no "conduct ... so intolerable that a reasonable person would be forced to resign, rather than to continue to endure it," and did not "believe that any juror could determine" that the actions of the bank's employees "were outrageous, coercive, or unconscionable." Plaintiff's motion for a new trial was similarly denied because "no reasonable juror could have made any finding in this case that there was any type of retaliatory harassment, or any type [of] retaliation, or any type of constructive discharge."
The judge correctly dismissed plaintiff's claim for emotional distress because there was no evidence that defendants intended to inflict distress upon plaintiff, and the distress that plaintiff suffered was not severe. To establish intentional infliction of emotional distress,
[T]he plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe.... For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress. Liability will also attach when the defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow.
[Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366, 544 A.2d 857 (1988).]
A defendant's conduct must be so outrageous and extreme that it is beyond the bounds of decency, and a civilized community would consider it atrocious and intolerable. Ibid. See Taylor v. Metzger, 152 N.J. 490, 508-21, 706 A.2d 685 (1998) (reversing a summary judgment in favor of defendant, a county sheriff who directed a single but vicious racial epithet at one of his officers). Here, viewing the evidence in a light most favorable to plaintiff, we cannot conclude that a jury could find in her favor.
Finally, we address plaintiff's argument that the judge erred in excluding evidence of the prior verdict against Ahern. Plaintiff sought to have that evidence admitted to support her claim that she could not work with Ahern at the Whippany branch after the failed audit in 1996, because he had been found guilty of age and gender discrimination at his previous job. Defense counsel sought to exclude plaintiff's reference to the prior case on the ground that in plaintiff's deposition testimony, she did not mention the case as a factor in her claims against Ahern. The trial judge granted defendants' motion to exclude the reference because it was "a surprise to the defense since Mrs. Settineri does not appear to have mentioned any place in her deposition testimony indicating that one of the reasons she was so upset and she wanted to move was because of knowledge that she had of Mr. Ahern...." We disagree with the trial judge to the extent that reference to the prior case could not have been a surprise to defendants because they had moved to exclude it prior to trial. Nevertheless, we find that exclusion of the evidence was harmless error, R. 2:10-2, because the claims against Ahern were properly dismissed *928 by the court under the statute of limitations.
We have carefully considered the record in light of the arguments of counsel and the applicable law, and we are satisfied that the judgment of the trial court is based on findings of fact which are adequately supported by the evidence. R. 2:11-3(e)(1)(A). We affirm the dismissal of plaintiff's claims and denial of her motion for a new trial substantially for the reasons stated by the trial judge on the record at the close of plaintiff's case, at the close of defendants' case and on the motion for a new trial.
Affirmed.