

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-13-2008

# Marangos v. Flarion Tech Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-2855

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Marangos v. Flarion Tech Inc" (2008). *2008 Decisions.* Paper 1604.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1604

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 07-2855

———————

VASSOS MARANGOS,
                                        Appellant

v.

FLARION TECHNOLOGIES, INC.

———————————

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 05-cv-04919
(District Judge: Honorable Garrett E. Brown, Jr.)

———————————

Submitted Pursuant to Third Circuit LAR 34.1(a)
February 12, 2008

Before:  SCIRICA, Chief Judge, HARDIMAN and ALDISERT, Circuit Judges.

(Filed: February 13, 2008)

———————

OPINION OF THE COURT

———————

PER CURIAM.

Vassos Marangos appeals an order of the United States District Court for the District of New Jersey granting summary judgment in favor of Flarion Technologies Inc. in his employment discrimination action. For the reasons that follow, we will affirm.

Marangos is a naturalized United States citizen and native of Greece. Flarion Technologies ("Flarion") is a wireless data communications company that was formed in February 2000, as a spin-off of Lucent Technologies. Marangos was employed as an engineer in the Radio Frequency Engineering Department ("RF") at Flarion on two separate occasions, from September 2002 to January 2003, and from March 2004 to March 2005.[1] The RF Department functioned as two separate groups: the "base station" group comprised mostly of natives of the former USSR ("Russians") and the "mobile product" group comprised mostly of "non-Russians." In his first employment at Flarion, Marangos worked under the manager of the RF Department, Victor Abramsky, a Ukranian. According to Marangos, Abramsky fostered an environment among the Russian base station group employees of speaking only in Russian with each other. This practice effectively shut out the non-Russian-speaking employees from the base station group's business and frustrated their ability to obtain positions in the base station group. Marangos resigned from his first period of employment in January 2003 for family reasons and to take another job. He noted in his telephone exit interview that he was

---

[1] Marangos worked at Lucent Technologies from 1987 to 2000, in their handset division, working on cell phone technology. In 2000, Marangos turned down an offer from Flarion be the manager of the RF Department and accepted a position at IBM as a senior engineering manager.

2

treated fairly by the company and was paid an adequate salary. He said that he would consider coming back to the company. As for his working conditions, he "felt there was a wall between Russians and non-Russians. Occasionally Victor spoke in Russian at meetings."

In March 2004, Marangos returned to Flarion. Soon afterward, he began working on the handset development project for Bill Weirtheim. Marangos was separated both physically and functionally from the RF Department, although he was technically part of the RF department and under Abramsky's management. According to Marangos, everything went well for him for the first nine months because he had virtually no contact with Abramsky except at weekly departmental meetings. In late 2004/early 2005, however, Abramsky rebuffed Marangos's suggestion that Abramsky promote Per Kristensen to run the base station group and promote someone like Marangos to run the mobile group.

In late January 2005, Flarion initiated extensive lay-offs. Although Marangos remained employed, Flarion terminated the handset project that he was working on and re-assigned him to work on a wireless mobile PC card project under Victor Abramsky's direct supervision. At around the same time, Marangos sent an anonymous letter to Flarion's CEO recommending changes in the company's organizational structure. He also started accepting phone calls from headhunters and went on at least two interviews during an approved five-day vacation in late January/early February. One of the companies he interviewed with was Sequoia Communications in California.

3

In mid-February 2005, tension between Marangos and Abramsky grew over Marangos's having taken his vacation in the middle of an important project and falling behind on the project schedule. Marangos and Abramsky exchanged a flurry of e-mails on Valentine's Day, 2005, which resulted in a face to face meeting later that day. Marangos expressed his concerns to Abramsky about the project. But the conversation quickly escalated to a "nasty" exchange in which Abramsky complained about Marangos's badly timed vacation and remarked about Marangos's personal life. Because Marangos felt insulted by Abramsky's personal comment, he threatened to sue; he also proclaimed that he had far more experience and was far more qualified than Abramsky to do Abramsky's job.

Immediately after the two men parted company on February 14, Marangos complained to the new Vice-President of Engineering and to the CTO about the situation in the RF department. He did not mention anything to them about ethnic discrimination, however, or about the presence of a hostile work environment based on ethnicity. Meanwhile, Abramsky e-mailed the Human Resources Department about Marangos's tardiness in attending meetings and his recent vacation leave, suggesting that "we can allocate resources in such a way as to meet the deliverables without Vassos [Marangos]." On February 15, Marangos had a follow-up meeting with the Vice-President of Engineering, at which he proposed a plan for reorganizing the department, including a recommendation that Abramsky be removed from his position. The Vice-President of Engineering told Marangos that he had investigated Marangos's complaints about how

4

the RF department was run and concluded that there was no reason to change anything. He suggested that Marangos concentrate less on organizational structure and more on his job. On February 16, Marangos apologized to Abramsky in an e-mail. On February 17, he attended a project status meeting at which Abramsky upbraided him for being late on the project schedule. Marangos shot back that, if Abramsky was going to fire him, he would quit first. After the meeting, Marangos spoke with the Vice-President of Engineering, who told Marangos to expect an e-mail warning him about his behavior at the meeting. Coincidentally, on February 17, Sequoia Communications offered Marangos a job for comparable pay. Marangos never received the Vice-President's warning e-mail message because he notified Abramsky that he was resigning in order to take the position at Sequoia. On February 22, Marangos submitted a resignation letter to Flarion and formally accepted Sequoia's job offer.

Marangos filed suit against Flarion in a New Jersey state court and Flarion removed the action to the District Court. Marangos's complaint raised claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), and the New Jersey Law Against Discrimination, N.J. Stat. Ann. §§ 10:5-1-10:5-49 ("NJLAD"), as well as claims of conspiracy, extortion, gross negligence (Flarion's conduct with respect to child support payments), and breach of contract under state law. Marangos contends that Flarion discriminated against him in assigning work, compensated him with a salary and stock options that were lower than his Russian counterparts, and denied him a promotion

5

because he was not Russian. He alleges that Flarion maintained a hostile work environment based on ethnicity and constructively discharged him.[2]

Flarion moved for summary judgment. In granting the motion, the District Court determined that Marangos's Title VII claims were barred because he had not filed a charge with the Equal Employment Opportunity Commission and the time for doing so had expired. Assessing the employment discrimination and hostile work environment claims solely under the NJLAD, the District Court held that, although Marangos had established a prima facie case of discrimination, he did not show that Flarion's legitimate, nondiscriminatory reasons for assigning work and compensating him were a pretext for discrimination. The District Court also ruled that Marangos's constructive discharge claim failed because there was no evidence that Flarion's conduct towards Marangos before he resigned was "outrageous, coercive or unconscionable." The court also rejected the hostile work environment claim because there was no record evidence showing severe and pervasive harassment in the way in which Abramsky managed his department. The District Court denied Marangos's remaining state law claims.

Marangos sought reconsideration, claiming that the District Court had disregarded or overlooked disputed facts and facts favorable to him. The District Court denied

---

[2] Marangos filed a motion to amend his Complaint to include a claim that Flarion retaliated against him by forcing him to resign when he complained to management about problems with Abramsky. The Magistrate Judge denied the motion. Marangos does not contest this ruling on appeal. In any event, the District Court addressed the claim in its opinion denying the constructive discharge claim.

6

reconsideration, concluding that none of the facts highlighted by Marangos as having been overlooked and/or disputed were material to the determination of his claims. The court also rejected Marangos's unsupported claim that the court treated him differently because he was proceeding pro se. The court pointed out that Marangos failed to meet the standard for reconsideration as he did not claim any change in the law or the availability of new evidence.

This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a grant of summary judgment, which (as the District Court explained) is appropriately entered only when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). For the same reasons set forth in the District Court's opinion, we will affirm the District Court's judgment as to Marangos's Title VII, conspiracy, gross negligence, extortion, and breach of agreement claims. We also will affirm the NJLAD discrimination, constructive discharge, and hostile work environment claims for substantially the same reasons set for by the District Court, with additional discussion provided below.

As recognized by the District Court, the McDonnell Douglas[3] burden-shifting framework applies to claims of discrimination under the NJLAD. See Keller v. Orix Credit Alliance, 130 F.3d 1101, 1114 n.5 (3d Cir. 1997) (en banc). Under this

---

[3] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

framework, if a plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to offer evidence that would be sufficient, if believed, to support a finding that the defendant had a legitimate, nondiscriminatory reason for the adverse employment decision. Id. If a defendant satisfies this burden, a plaintiff may then survive summary judgment by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Id. The issues here are whether the District Court correctly decided that Flarion established a legitimate, nondiscriminatory reason for the adverse actions complained of and, if so, whether Marangos established that the reason was a pretext for discrimination.

We conclude that the District Court's analysis and entry of summary judgment are fully supported by the record. Assuming that Marangos showed that Flarion discriminated against him on account of his ethnicity with respect to his compensation and denial of promotion, Flarion established legitimate, nondiscriminatory reasons for the alleged adverse actions. See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (noting that the employer's burden to articulate a legitimate, nondiscriminatory reason is "relatively light").

In its summary judgment motion, Flarion explained that it assigned Marangos to work on handsets and mobile technology because of his extensive prior work experience in that area; he was paid a salary commensurate with his experience, performance and

seniority. In response to the summary judgment motion, Marangos pointed to no evidence from which a factfinder could reasonably disbelieve Flarion's articulated legitimate reasons. In particular, Marangos did not establish that he had received less compensation in salary and/or stock options than comparable Russian employees in the RF department. To the contrary, he stated in his deposition that he was basing his conclusion on speculation that the Russian employees possessed experience and technical skills comparable to his. Marangos Dep. at 94-95. Marangos points to Flarion's organizational chart from 2001 as conclusive evidence that Abramsky formed a Russian bloc directly under his control by forcing non-Russians to quit or be fired. But the organizational charts for subsequent years indicate no such division. See Appdx., Exhs. N and U.

As for the alleged failure to promote Marangos, there is no record evidence that a job opening actually existed for which he applied and was rejected based on his ethnicity. According to Marangos's sworn deposition, the discussion about his promotion occurred in the context of his recommending certain departmental changes to Abramsky and was dependent on moving another employee, Per Kristensen, from his present position to a new one as the manager of the base station group. See Marnagos Depo. Tr. at 107. Marangos suggested that someone like himself could then move into Kristensen's old job as manager of the mobile group. Id. Abramsky told him, "That would be the day." Id. at 108. Marangos had suggested a similar change in department structure in an e-mail he sent to Abramsky in November 2004. And, in January 2005, he communicated with

9

Abramsky by e-mail to clarify his reporting responsibilities, implying that he expected that he would be moved up into a team leader position. Abramsky responded that Marangos would continue reporting to Per Kristensen as he had in the past. The most that can be inferred from the November 2004 and January 2005 e-mail messages and from Marangos's deposition is that there was some talk about departmental changes. There is no evidence, however, that Flarion acted on the suggested changes in 2004-2005. It wasn't until 2006, long after Marangos left the company, that Flarion advertised a job opening for the base station manager position. A Flarion employee, Peter Suprunov, was promoted to the position.

Turning to the hostile work environment claim, the District Court correctly noted, that the harassment complained of must be "severe or pervasive enough to make a reasonable person with the victim's protected characteristic believe that the conditions of his employment have been altered and his work environment has become hostile or abusive." Hargrave v. County of Atlantic, 262 F.Supp. 393, 411-12 (D.N.J. 2003) (citing Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587 (N.J. 1993). Because Marangos's discriminatory harassment claims are not facially ethnically race-based, he must demonstrate that only ethnic minorities suffered the harassment he alleges, or that it is more likely than not that the harassment occurred because of his ethnicity. Id. at 605.

Marangos set forth no evidence that he was treated differently from his Russian co-workers with respect to "mandatory" after hours drinking get-togethers, or in the processes by which they were hired, given performance evaluations, or granted vacation

10

leave.  Marangos points to the Currall and Zekis affidavits to support his assertion that the Russian engineers in the base station group and Abramsky conducted their technical discussions exclusively in Russian as much as sixty percent of the time.  The record evidence indicates that they talked about technical matters and on occasion "badmouthed" other directors and departments as being slow or basically incompetent.  Making such disparaging comments about someone's work performance may be distasteful, but it does not constitute harassment.  Marangos does not claim that any of engineers in the base station group or Abramsky made ethnic slurs or explain how their comments in Russian disparaged him or the other mobile group engineers in some way that could be considered ethnically based.  Moreover, although he points to other employees, Marangos has not alleged that he himself was discriminated against in any way in the first period of employment, and he admits that the first nine months of his employment in 2004-2005 were trouble-free.

As for the constructive discharge claim, we are not convinced that, based on the record evidence, a reasonable jury could find Abramsky's conduct to have been so "outrageous, coercive and unconscionable" that it would have forced Marangos to resign. See Shepherd v. Hunterdon Developmental Center, 174 N.J. 1, 803 A.2d 611, 628-29 (N.J. 2002).  Flarion explained that Marangos's performance began to decline at the same time his unprofessional behavior escalated in the wake of the workforce reduction in early 2005.  Initially, Flarion encouraged Marangos to focus less on recommending changes in the company's organizational structure and more on his work.  But after Marangos's

11

flare-up with Abramsky at the staff meeting on February 17, the Vice-President of Engineering basically warned Marangos that he would be receiving a letter about his behavior.

According to Marangos, Abramsky's February 11 e-mail message questioning the amount of vacation leave that he took signaled the beginning of a plot by Abramsky to fire him because he was not Russian. Marangos also argues that Abramsky retaliated against him for complaining to upper management, stating in an e-mail message to the Human Resource Department on February 16, that the RF department could "produce the deliverables without Vassos." Even if we may infer from the February 16 e-mail that Abramsky wanted to fire Marangos, Marangos has failed to show that his report to upper management about Abramsky's poor management skills constituted a protected activity. Marangos's February 14 and 15 e-mail messages to the Vice-President of Engineering and the CTO (Appdx. Exhs. "JJ" & "KK") indicate that Marangos complained about Abramsky's personality and his incompetence in managing the RF department, not ethnicity-based discrimination. See also Marangos depo. Tr. at 141. Furthermore, regardless of what Abramsky may have wished, it is undisputed that Flarion did not terminate Marangos. We agree with the District Court that Flarion's conduct was not so "outrageous, coercive, and unconscionable" as to force Marangos to resign.

A reasonable juror could conclude from the record evidence that Marangos had intended to move to a different job for reasons other than the conditions of discrimination that he alleges existed at Flarion. See Shepherd v. Hunterdon Developmental Center, 174

12

N.J. 1, 803 A.2d 611, 628 (N.J. 2002). Marangos began actively seeking other job prospects well before his blow-up with Abramsky on Valentine's Day. He attended job interviews during his vacation in early February, shortly after Flarion conducted massive layoffs. A reasonable juror could also conclude that Marangos did not do all that was reasonably necessary to remain employed. Id. His apology to Abramsky on February 16 suggests that, in the absence of any other job opportunity, he was inclined to work things out with Abramsky. But, as soon as Sequoia made a job offer on February 17, he changed his mind and chose to quit that day.

We have throughly considered Marangos's remaining arguments on appeal and conclude that they are meritless. Accordingly, the judgment of the District Court will be affirmed.