OPINION
POLLAK, District Judge.
Plaintiffs Vincent Sgro, Albert Bassano, Vera Stek, and Ann Walker, invoking the *935 diversity jurisdiction of the United States District Court for the District of New Jersey, brought suit against defendant Bloom-berg L.P. on discrimination and retaliation claims arising under the New Jersey Law Against Discrimination.[1] The District Court granted summary judgment in favor of defendant. Plaintiffs appeal. We will affirm as to all but Sgro’s claim of unlawful retaliation.
I
Because we write solely for the parties, we summarize only the essential facts.
Bloomberg is an international media company that provides news and financial information through a proprietary computer service known as the Bloomberg Professional Service (“the Bloomberg”). Bloom-berg News is a division of Bloomberg that makes news articles available through the Bloomberg. Bloomberg’s other divisions include Global Data, which provides content for the Bloomberg.
Bloomberg hired Sgro and Bassano in 1991. Both were 49 years old at the time. Prior to being hired, Sgro and Bassano had been the owners of Petroleum Publications since 1972. In that capacity, they wrote, edited, and published a weekly petroleum pricing publication, the Oil Buyer’s Guide. In 1991, Bloomberg purchased Petroleum Publications from Sgro and Bassano, and Bloomberg agreed to employ Sgro and Bassano for three years. Sgro signed a three-year employment contract with Bloomberg that specified that he would “be employed three days per week.”
For the first year of that contract, Sgro was not asked to do any actual work for Bloomberg, while- Bassano continued to work on the Oil Buyer’s Guide as a member of Bloomberg’s Energy Department. After one year, however, Sgro began writing a column on arts and collectables, with a focus on coins and stamps. After the three-year contract term expired, Sgro and Bassano continued on at Bloomberg, with Sgro receiving his same salary and working on the column and other cultural articles. At some point, Sgro began to work four days per week. Bassano, meanwhile, began to write a column about wine for the Bloomberg.
In 1995, Bloomberg News hired Stek, who was 43 years old at the time, to work part time editing news articles. She became a full-time employee in 2000.
In 1997, Sgro, Bassano, and others working on similar articles became the staff of Bloomberg’s new Lifestyles department, a division independent of Bloom-berg News that produced items for the Bloomberg on subjects such as arts, collectables, and related topics. Beginning around April 1997, plaintiffs Sgro, Bassa-no, and Stek were all members of Bloom-berg’s Lifestyles department, with Stek editing articles written by Sgro and Bassa-no. All five members of the Lifestyles department were older than 40.
Around July 2001, after a Lifestyles employee (not one of the plaintiffs) published an article with erroneous factual assertions, Bloomberg transferred the Lifestyles department into Bloomberg’s larger News division, under the supervision of John McCorry and Matt Winkler, both of whom were 46 years old at the time. Although Sgro and Bassano continued to publish articles on lifestyles topics, they *936 contend that their responsibilities were restricted. At a meeting on September 5, 2001, McCorry criticized the work produced by the Lifestyles staff, while Sgro, Bassano, and Stek complained that they were receiving disparate treatment. As a result of these complaints, plaintiffs contend, they were punished by being made to do tedious data entry work.
Later in 2001, Sgro, Bassano, and Stek were transferred to Bloomberg’s Data department, under the supervision of Gail Gross. The News department, meanwhile, hired experienced journalists and art critics to report on lifestyles issues. Since 2004, a group within News, called “Muse News,” has been responsible for reporting on culture and the arts. Muse News is run by 59-year-old Manuela Hoelterhoff, the recipient of a 1983 Pulitzer Prize. In February 2004, Bloomberg reassigned Bassano’s wine column to John Mariani, a well-known restaurant critic and food expert.
In the Data department, Sgro, Bassano, and Stek initially worked in the web indexing group while also assisting Bloomberg’s New York office with the development of lifestyles-related events and seminars (e.g. wine tastings and cooking demonstrations). In June 2003, Beth Mazzeo, the director of the Data group, transferred complete control of these seminars and events to Bloomberg’s New York office. Mazzeo was 44 years old at the time. Throughout their time in the Data department, plaintiffs lodged complaints in an unsuccessful attempt to be transferred to new positions within Bloomberg.
In May 2003, Stek left Bloomberg for health reasons. In July 2004, Sgro and Bassano were transferred within the Data department to the Prospect/Products Development (PROS) group, under the supervision of Ray Whitman. According to Bloomberg, Sgro and Bassano were transferred due to PROS’s need for additional resources; according to Sgro and Bassano, they were transferred as punishment for their written complaints of having received disparate treatment on account of age.
That same summer, Sgro’s managers requested that he begin to work a full five-day work week because, according to Bloomberg, the rest of the Global Data team was required to work five days per week. Sgro refused, and soon began a medical leave that lasted until February 2005. When Sgro returned from his leave, he continued to refuse to work five days per week. Sgro (along with the other plaintiffs) filed the complaint in this case on February 7, 2005. Bloomberg terminated Sgro’s employment on March 21, 2005. Bassano remains employed by Bloomberg.
Plaintiff Walker, meanwhile, had less involvement with her co-plaintiffs. In October 2000, Bloomberg hired Walker, then 47 years old, as a full-time employee in its Creative Services department in Princeton, New Jersey. Her role was to assist the creative director and art director in creating sales and marketing materials for Bloomberg. In the summer of 2001, the Creative Services department relocated to New York. Bloomberg offered Walker a position with the Creative Services department in New York, but she refused. Instead she accepted a position under the supervision of Gail Gross in the Data department in Princeton, NJ, alongside Sgro, Bassano, and Stek. At that point, all of Gross’s employees were over the age of fifty.
In the spring of 2002, Walker inquired about a new position in the Creative Services department in New York. According to Walker, she was discouraged from applying for that position. In October 2002, she joined the Creative Strategy team in the Data group. In Creative Strategy, *937 Walker worked on event planning and marketing for the Data group. In September 2004, Creative Strategy was disbanded, and Walker was left with no formal position within Bloomberg.
Walker claims that someone told her that Mazzeo, the director of the Data group, had commented, “Ann is going to have a heart attack” and that a Human Resources employee at Bloomberg told Walker directly that she was “not a fit.” After losing her position with Creative Strategy (but not her employment with Bloomberg), Walker searched for jobs within Bloomberg using Bloomberg’s internal job postings bulletin. Walker claims that two other Creative Strategy employees, both younger than Walker, were offered new positions that had never been listed on the internal postings bulletin. On November 9, 2004, Walker began a medical leave. She remains on leave.
II
The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1) and 1442, and we have jurisdiction pursuant to 28 U.S.C. § 1291.
We review the District Court’s grant of summary judgment de novo, applying the same standard that it used. Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir.2008). That is, we will view the evidence in the light most favorable to plaintiffs and draw all justifiable, reasonable inferences in their favor. Id. We will affirm if “the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that [Bloomberg] is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c).
III
The New Jersey Law Against Discrimination (NJLAD), N.J. Stat. § 10:5-12(a), makes it unlawful “[f]or an employer, because of the ... age ... of any individual ... to discriminate against such individual in compensation or in terms, conditions, or privileges of employment^]” Section 12(d) of the NJLAD prohibits retaliation against an employee because that employee “has opposed any practices or acts forbidden under [the NJLAD] or because that person has filed a complaint, testified or assisted in any proceeding under [the NJLAD.]”
An NJLAD plaintiff may prove discrimination or retaliation according to the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under McDonnell Douglas, the plaintiff bears the initial burden of establishing a prima facie case of unlawful discrimination. Id. at 802, 93 S.Ct. 1817. If the plaintiff succeeds, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer’s action. Id. Once the employer meets its relatively light burden, the burden of production returns to the plaintiff, who must show by a preponderance of the evidence that the employer’s proffered reason is pretextual. See id. at 804-05, 93 S.Ct. 1817 Accordingly, once an employer has proffered a legitimate, nondiscriminatory reason, the plaintiff:
generally must submit evidence which: (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.
Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir.1994).
*938 A.
As a threshold matter, the District Court held that plaintiffs’ claims were barred by the NJLAD’s two-year statute of limitations to the extent they sought compensation for harms allegedly suffered prior to February 7, 2003. We agree.
New Jersey courts recognize that “[w]hen an individual is subject to a continual, cumulative pattern of tortious conduct,” as is the case when a plaintiff is subject to a hostile work environment, “the statute of limitations does not begin to run until the wrongful action ceases.” Wilson v. Wal-Mart Stores, 158 N.J. 263, 272, 729 A.2d 1006 (1999). However, to qualify for the equitable continuing violations doctrine, “the plaintiff must establish that the harassment is ‘more than the occurrence of isolated or sporadic acts of intentional discrimination.’ ” West v. Philadelphia Elec. Co., 45 F.3d 744, 755 (3d Cir.1995) (quoting Jewett v. Int’l Tel. and Tel. Corp., 653 F.2d 89, 91 (3d Cir.1981), cert. denied, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981)).
Thus, discrete acts—such as the demotions, transfers, failures to promote, ■and other adverse employment actions that plaintiffs allege they experienced due to then- ages—do not fall under the continuing violations doctrine and are subject to the NJLAD’s two-year statute of limitations. Accordingly, the District Court did not err in holding that plaintiffs’ age discrimination claims, other than their claim of a hostile work environment, are barred as to events that took place prior to February 7, 2003 (two years prior to the filing of plaintiffs’ complaint).
B.
In order to make a prima facie case of age discrimination under the NJLAD, a plaintiff must demonstrate that she (1) is a member of the protected class, (2) was qualified for the position held, (3) suffered an adverse employment action, and (4) “ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination.” Monaco v. American General Assur. Co., 359 F.3d 296, 300 (3d Cir.2004) (holding that the elements of a prima facie case under the NJLAD are the same as those under the federal ADEA). Defendant disputed only the fourth element.
The District Court held that plaintiffs did not provide sufficient evidence to prove that they were replaced by younger employees, and also that, even if plaintiffs established a prima facie case, they failed to rebut Bloomberg’s legitimate nondiscriminatory reasons for its actions. Because we agree that the plaintiffs failed to rebut Bloomberg’s proffered reasons, we need not consider whether plaintiffs made out a prima facie case.
Bloomberg pointed to several business needs that motivated their decisions regarding the plaintiffs’ job placements, and none of the rebuttal evidence provided by plaintiffs “demonstratefd] such weaknesses, implausibilities, inconsistencies, inco-herencies, or contradictions in the employer’s proffered legitimate reasons for its action that a reasonable factfinder could rationally find them ‘unworthy of credence,’ and hence infer ‘that the employer did not act for [the asserted] non-discriminatory reasons.’ ” Fuentes, 32 F.3d at 765 (citations omitted). The crux of plaintiffs’ pretext argument on appeal is that defendants’ job placement decisions did not “make sense” in light of plaintiffs’ salaries and capabilities. But plaintiffs must show more than that the defendants’ business decisions were bad for business. Furthermore, the District Court did not err in concluding, based on the evidence of record, that there was no meaningful evidence to support plaintiffs’ claim that Bloomberg *939 human resources employee Lori Oliveri (whom plaintiffs allege was biased against older workers) had any direct involvement in any of the plaintiffs’ adverse employment actions.[2] C.
Under the NJLAD, a plaintiff makes out a prima facie case of retaliation by showing “(1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action.” Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir.2001) (citations omitted). As the District Court rightly concluded, only Sgro can make out a prima facie case of retaliation because only Sgro can point to any causal connection between protected activity and an adverse employment action.
The protected activities relevant to Sgro’s retaliation claim are (1) complaints in July of 2004 that the members of the Lifestyles group were being discriminated against due to their age; and (2) Sgro’s filing this lawsuit. Sgro’s termination unquestionably constituted an adverse employment action,[3] and the District Court did not err in concluding that the temporal proximity between his filing suit and his termination was sufficient to raise a presumption that a causal relationship existed between those two events. See Shellenberger v. Summit Bancorp., Inc., 318 F.3d 183, 189 (3d Cir.2003) (“The amount of time between the protected activity and the alleged retaliation is a circumstance to be considered by a fact-finder in determining if the plaintiff has established the required causation.”). Thus, the relevant inquiry for the District Court was whether Bloomberg proffered a legitimate nonreta-liatory reason for firing Sgro that Sgro could not rebut.
Bloomberg asserts that it fired Sgro because he refused to work five days per week, which, on its face, is a legitimate *940 nonretaliatory reason that shifts the burden to Sgro. The District Court erred, however, in concluding that a reasonable jury could not find that Bloomberg’s proffered reason was pretextual. Although there may not be sufficient evidence on the record to demonstrate that age discrimination motivated Bloomberg to require Sgro to work more, there is evidence on the record to suggest that the timing of that request represented retaliation for his complaints.
According to the terms of his original employment contract with Bloomberg, Sgro had worked fewer than five days per week from the moment he was hired in 1991 until 2004. After he was transferred to the PROS group, which was supervised by Ray Whitman, Sgro had a number of meetings with Whitman. In his deposition, Sgro described a meeting with Whitman that took place soon after Sgro went to work for Whitman on July 6, 2004, but before Sgro went on medical leave in August 2004:
I told Ray Whitman personally before I went on medical leave that this job was demeaning.
... This is being done to harass, to create a hostile work environment, to get me out of here and the other people from the Lifestyles, that’s why it’s demeaning, I resent it, and that’s what I told him.
... And I did say to Ray at one of these meetings, I said, “Ray, you should be ashamed of yourself because you’re doing the same thing to me that you did to Marlene Lucas,” who went into depression for many, many months, the same thing. Calling her out of her normal work. She was there 15 years, had excellent reviews, all of a sudden she moved over to Whitman, and guess what, the reviews were down to nothing and they switch her to a rogue job and then they start comparing her to 25 year olds[.]
The foregoing verbal complaint — in which Sgro used the term “hostile work environment” and specifically likened himself to another employee who was disadvantaged in favor of a younger employee — constituted protected activity under the NJLAD.[4] Sometime on or around July 28, 2008, Bloomberg requested that Sgro begin working a full-time schedule of five days per week, for no extra compensation. Sgro refused because he felt that a verbal agreement with Michael Bloomberg required Sgro to work no more than three days per week.
The District Court concluded that Bloomberg asked Sgro to increase his work schedule “since every other member of the Global Data group was working full time” and therefore held that Sgro .could not demonstrate pretext. Sgro, however, had been working in Global Data since 2001, and it was only when he was transferred to PROS, a workgroup within Global Data, that Bloomberg demanded he work five days per week. While that increased work requirement might have been entirely justifiable for business reasons, a reasonable jury could conclude that its suddenness points to retaliation by Bloomberg. See, e.g., Delli Santi v. CNA Ins. Companies, 88 F.3d 192, 200 (3d Cir.1996) (holding that, under the NJLAD’s retaliation provision, the employer’s sud *941 den investigation of employee’s low gas mileage reports after years of employee submitting these suspicious reports without incident indicated a retaliatory motive). Accordingly, Sgro raised a material issue of fact about whether or not his termination was retaliatory, and the court should not have granted summary judgment on this issue for Bloomberg.
D.
Unlike plaintiffs’ age discrimination and retaliation claims, hostile work environment claims fall under the continuing violations exception to the NJLAD’s two-year statute of limitations. See Shepherd v. Hunterdon Developmental Center, 174 N.J. 1, 20, 803 A.2d 611 (2002) (“It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.”). We agree with the District Court that plaintiffs’ claims alleged, for the purposes of determining whether or not to apply the continuing violations theory, a hostile work environment.
New Jersey courts treat hostile work environment claims under the NJLAD the same as the Supreme Court treats hostile work environment actions under Title VII. See Shepherd, 174 N.J. at 20-21, 803 A.2d 611 (applying the analytical framework from National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). “When the workplace is permeated with ‘discriminatory intimidation, ridicule, and insult,’ that is ‘sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment,’ Title VII is violated.” Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations omitted). The Supreme Court has instructed courts about what factors to consider when determining whether the standard for a hostile work environment claim has been met:
In determining whether an actionable hostile work environment claim exists, we look to “all the circumstances,” including “the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.”
Morgan, 536 U.S. at 116, 122 S.Ct. 2061 (citing Harris, 510 U.S. at 23, 114 S.Ct. 367).
The District Court held that plaintiffs’ hostile work environment claim could not survive summary judgment for two reasons: (1) because plaintiffs “failed to establish that any hostility towards them was motivated by their ages” and (2) because the conduct alleged by plaintiffs was not sufficiently severe or pervasive. We agree with both conclusions.
As the District Court noted, the crux of plaintiffs’ allegations is that they were given demeaning job assignments that were incommensurate with their experiences and abilities. Hostile work environment claims, however, are designed for work environments characterized by an excess of discriminatory ridicule or other intimidating behavior. Plaintiffs’ evidence, even when taken in the light most favorable to them, does not come close to demonstrating a work environment of this nature. On appeal, appellants emphasize that these demeaning job assignments drove some appellants to seek medical leaves for psychological reasons. A job assignment, however, is the type of adverse employment action that can ground a claim of age *942 discrimination in the terms of employment, not the type of harassment or intimidation relevant to a hostile work environment claim. Moreover, for reasons analyzed in Section III.B, mpva, plaintiffs cannot show that those employment actions were caused by age discrimination.
IV
The judgment of the District Court will be reversed insofar as it granted summary judgment to Bloomberg on Sgro’s retaliation claim. It will be affirmed in all other respects. This matter will be remanded to the District Court for further proceedings consistent with this opinion.

. In the complaint, plaintiff Walker also alleged discrimination on account of her disability, plaintiff Stek also alleged sexual harassment, and all plaintiffs also alleged the tort of intentional infliction of emotional distress. On appeal, appellants press only their claims of age discrimination (including their allegation that they were subject to a hostile work environment) and retaliation.

. We reject appellants' general claim that the District Court engaged in improper factfind-ing on this and other issues.

. Sgro filed his complaint prior to his termination. At summary judgment, Sgro argued that his termination was retaliatory and violated the NJLAD. However, Sgro never filed an amended complaint alleging retaliatory termination specifically. Bloomberg argues that Sgro's failure to file any pleadings alleging retaliatory termination should bar Sgro from raising this argument on appeal.
Bloomberg is correct that, in this circuit, "we decline to permit a party to argue on appeal causes of action that were not pleaded in district court.” Murray v. Commercial Union Ins. Co., 782 F.2d 432, 437 (3d Cir.1986). In Murray — the only Third Circuit case cited by appellee in support of its position — we rejected appellants' attempt to appeal its original and unsuccessful trespass claim under the "newly developed theory of liability" of either wrongful discharge or, in the alternative, tortious interference with contractual rights. Id. at 436-37.
In contrast, Sgro has appealed under the same theory of liability, retaliation, pled in the complaint and argued to the District Court at the summary judgment stage. The precedential out-of-circuit cases that appellee cites are all distinguishable; unlike the instant matter, they involve situations in which the appellant did not raise an issue in the complaint and failed to raise the issue until the appellate stage. Thus, appellees have cited no case on point that would prevent this court from hearing Sgro's retaliatory termination claim insofar as that claim is, as a legal matter, equivalent to the complaint's properly pled count of retaliation. Nor are there any policy reasons that would urge us not to consider that claim, as the parties briefed and argued the specific issue of retaliatory discharge to the court below at the summary judgment stage. In its opinion, the District Court explicitly considered (and rejected) Sgro's allegation of retaliatory discharge. Because we are reviewing the outcome of that decision, we have no good reason not to reach Sgro's claim for retaliatory discharge.

. We recognize that the precise timing of Sgro's verbal complaints to Whitman is not entirely clear from the record, and that it may be the case that Sgro’s complaints came only after he was told to increase his work schedule. That does not appear, however, to have been the case. In any event, we construe the facts on summary judgment in the light most favorable to Sgro, and thus any confusion about the precise sequence of events here should be resolved at trial.