**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1802-19

DONNA PORCARO,

    Plaintiff-Appellant,

v.

TOWNSHIP OF ROCHELLE
PARK, a body politic, TOWNSHIP
OF ROCHELLE PARK POLICE
DEPARTMENT, ROBERT
FLANNELLY, individually and
in his official capacity,

    Defendants-Respondents.

_____

Argued September 28, 2021 – Decided November 16, 2021

Before Judges Messano, Accurso, and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-5006-17.

Evan L. Goldman argued the cause for appellant (Goldman Davis Krumholz & Dillon, PC, attorneys; Evan L. Goldman and Kristen Ragon, on the brief).

Christopher C. Botta argued the cause for respondents (Botta Angeli, LLC, attorneys; Christopher C. Botta and Natalia R. Angeli, on the brief).

PER CURIAM

In this employment matter, plaintiff Donna Porcaro, a former Township police officer, appeals from a December 3, 2019 order granting summary judgment in favor of defendants Township of Rochelle Park, Township of Rochelle Park Police Department (RPPD or Department), and Robert Flannelly, who served as Chief of the RPPD when plaintiff instituted this litigation. We affirm in part and reverse in part.

Plaintiff joined the RPPD in August 2003. Twelve years later, in December 2015, she was involved in an on-duty shooting and never returned to work. She qualified for accidental disability benefits and retired from the RPPD in November 2016. Plaintiff expressed an interest in becoming Flannelly's secretary upon her retirement but was not hired for the position.[1]

In July 2017, plaintiff filed a complaint against defendants, alleging: (1) a hostile work environment, in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50 (count one); (2) adverse

---

[1] The record reflects the secretarial position remained vacant while this case was pending in the trial court.

employment action, in violation of the LAD (count two); (3) retaliation, in violation of the LAD (count three); (4) failure to pay, in violation of New Jersey's Wage and Hour Law, N.J.S.A. 34:11-56a to -56a41, and Wage Payment Law, N.J.S.A. 34:11-4.1 to -4.14 (count four); (5) a violation of public policy (count five); (6) a violation of New Jersey's Civil Rights Act, N.J.S.A. 10:6-1 to -2, and New Jersey's Constitution (count six); (7) respondeat superior, vicarious and Monell[2] liability against the Township as well as the RPPD (count seven); and punitive damages against all defendants (count eight).

Regarding her hostile work environment claim, plaintiff alleged, and for the purpose of the summary judgment motion defendants either conceded as true or included it in their lengthy statement of material facts, that as the only female police officer ever hired by the Department, plaintiff was subjected to a video of a man slapping his penis across a woman's face and hand drawings of penises repeatedly displayed throughout the Department, to the point where she would have to conduct "sweeps" to remove the drawings before taking children on tours of the Department. In fact, Flannelly asked her to perform such "sweeps." Moreover, she stated Flannelly told her she was "crazy and that all women are

---

[2] Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

crazy." Further, she alleged that on one occasion when she was pregnant, Flannelly told her as she walked away from him that he was going to "take a picture of [her] ass because it got so big."

Additionally, another male colleague purportedly asked her when she was in uniform and wearing her vest if that was "all [her] or is that the vest," gesturing at the size of her breasts. Plaintiff claimed, too, that after she gave birth to her child, defendants failed to make reasonable accommodations for her when she was breastfeeding, specifically by not allowing her to take breaks to pump her breast milk or to store her breast milk in the Department's freezer. Moreover, plaintiff alleged that "[o]n virtually every shift, from the day she started until the day her employment ended, she was subjected to sexual jokes" and to male officers calling each other extremely offensive names such as "dick," "pussy" or "cunt," or "'dick punch[ing]' each other" in her presence.[3]

Plaintiff maintained that Flannelly, despite his supervisory position, not only failed to discourage this offensive behavior, but actively participated in creating a hostile work environment. For example, she alleged he made

---

[3] We include this offensive language in our opinion solely to reflect the grounds asserted by plaintiff to support her hostile work environment claim. We intend no disrespect.

comments about her appearance and told fellow employees that plaintiff had a "good body," "big boobs," and would be a "fun time." Plaintiff also asserted Flannelly told her directly she "cleaned up nicely" and he would hire her as his secretary but only if she wore a "French maid's outfit." Further, she alleged Flannelly improperly suggested the Department's dispatcher, Nicholas Cuocci, had fathered her child because he claimed plaintiff's daughter bore a resemblance to the dispatcher.

According to plaintiff's complaint, over the course of her employment, she also was: given less overtime than other officers; denied opportunities for training; passed over for assignments and activities offered to male officers; denied timely reimbursements for college credits; forced to go on calls without a backup officer, contrary to department policy; compelled to share the designated female officers' locker room with male coworkers; and "always rotated to a shift where she was the junior officer," even though officers hired after her were rotated to shifts where they enjoyed senior officer status. In sum, plaintiff alleged that "[d]uring the course of her employment, from beginning to end, and even beyond, [she] suffered a severe and pervasive hostile work environment which resulted from continuous long-term sexual harassment, and discrimination and harassment because of her gender." (emphasis added).

 A-1802-19

Cuocci, plaintiff's former co-worker, was deposed during discovery. He provided testimony consistent with some of plaintiff's allegations. For example, he testified he saw penis drawings in the lunchroom and "erased several" such drawings "on a dry erase board." Further, he testified he was present when another officer watched pornographic videos while in the dispatch center. Cuocci also stated that plaintiff "didn't even have her own locker room. [Male officers] used to walk in and out of her . . . locker room. That's not respectful." Cuocci testified, too, that Flannelly made comments that plaintiff "had a good body on her, big boobs. She would probably be a fun time. Things like that." According to Cuocci, Flannelly also said that plaintiff "was sleeping around and had several sexual relationships with several men" and "that [Cuocci] was the father of her baby. That the resemblance was there, that the daughter looked like [Cuocci], and that [the two] were sleeping around. And then that she was sleeping around with [two other officers]."

Additionally, Cuocci testified that during his time as a dispatcher for the RPPD, Flannelly and other male officers commented on how plaintiff "couldn't handle the job," and that "[f]emales don't belong on the police force. They should be in records, or they should be doing something else, being a housewife or a French maid." Cuocci further stated he remembered one male officer

A-1802-19

commenting that plaintiff "doesn't need back-up. If she wants to be in a male-dominated environment, she needs to act like a male."

Flannelly served as Captain of the RPPD starting in 2005, and he became Chief of the Department in 2012. When he was deposed in October 2018, Flannelly stated his duties as Captain included handling administrative work, managing sick time and department policies, and "assist[ing] the [C]hief with the day-to-day operation of the Police Department." Flannelly also testified he was unaware of any female police officer besides plaintiff having been hired by the RPPD. Flannelly denied that male officers in the RPPD watched, possessed, or displayed pornography or other obscene material at Headquarters. However, he recalled that one officer reported walking into his office to find plaintiff "watching some type of pornographic stuff" "on her first day of light duty," and that plaintiff was verbally reprimanded for the incident.

During his deposition, Flannelly described other events for which plaintiff was disciplined, but denied he harassed plaintiff in any manner. He also denied making remarks that plaintiff's daughter looked like Cuocci. But Flannelly admitted male officers used the "women's locker room" at Headquarters, explaining, "you got to understand it's probably eight to ten lockers, a shower

and a bathroom. There was only one officer using it. So, if she wasn't using it, it's pretty common the guys used the bathroom."

Defendants moved for summary judgment and requested dismissal of plaintiff's complaint. On December 3, 2019, the parties appeared for argument. The judge initially informed counsel that she analyzed the motion by going "through the facts and which ones either are unsupported by anything that plaintiff can cite to or . . . , even if plaintiff's allegations are accepted, then are they otherwise barred either by [the] statute of limitations or because they don't collectively amount to a hostile work environment."

Defendants' counsel offered "to streamline" her argument and represented certain counts in plaintiff's complaint, specifically counts four through seven, should be dismissed because they were no longer in dispute. The judge asked plaintiff's counsel if he agreed the claims recited by defendants' counsel were no longer contested, to which he responded, "I do." He added, "we don't have any reason to contest what the defense has said with regard to those complaints."

Next, defendants' attorney conceded that "in the summary judgment world, we are standing before the court and saying everything [plaintiff's] saying is true, just for argument's sake and she's entitled to all favorable inferences." When the judge asked if defendants admitted "there were hand[-]drawn pictures

of penises throughout [plaintiff's] tenure," defendant's counsel acknowledged "for purposes of [today only], hand[-]drawn pictures of penises were found in [H]eadquarters." Defendants' attorney further noted that "[plaintiff] talks about how everyone uses the term 'dick' or . . . dick punches each other, right? But they're doing it to each other. They're all using it." After citing to additional allegations raised by plaintiff, the judge asked defendants' attorney, "You don't think a jury could find that that's a hostile environment?" Counsel responded in the negative, explaining there were other "cases where the conduct was so much more egregious" but was not found to be "severe and pervasive enough."

Defendants' attorney further contended that "the majority of [plaintiff's] claims are time barred," but if the court found "some of [plaintiff's] allegations fall . . . within [the] two-year window, the Roa[4] Court did hold an untimely claim does not sweep in prior untimely discrete acts [which] the plaintiff knew or ought to have known gives rise to a claim."

Plaintiff's attorney countered that there was "an extensive amount of factual issues and factual disputes" militating against an award of summary judgment. He argued some of the gender-based actions taken by plaintiff's

---

[4] Roa v. Roa, 200 N.J. 555 (2010).

former co-workers "may not [have been] actionable at that time as a discrete discriminatory act" and that "a single act of harassment may not be actionable on its own. Such claims are based on a cumulative effect of individual acts." He further contended:

> [I]t could be reasonably argued before a jury that this was a whole series of acts that individually may not have given rise . . . to a specific claim for discrimination, especially as it continued to evolve and . . . it continued to go on up until the time that she's out on disability with the comment by [Chief] Flannelly that yeah, she can come back to work as my secretary as long as she wears a French maid outfit. So that is continuing all throughout the course of her employment there.
>
> [emphasis added.]

The judge interjected, "how can a rational factfinder accept that the work environment was so hostile, as she's claiming it was, in the face of her desire to return to it?" Plaintiff's counsel responded that "the idea of whether it's severe and pervasive to alter the conditions of her employment, . . . I think all the case law deals with the fact that that is not necessarily a decision for a trial court to make, but as a rational factfinder" and "there are certainly ample facts to go before a jury." He added:

> [T]o make . . . life a little easier for you, I acknowledge that some of the things that Your Honor has stated and have been argued may not give rise to a claim of hostile

10

work environment. And Your Honor then has a right to strike those claims or those specific aspects of the case.

But I think that we have produced a sufficient amount of evidence and contested facts which will allow at least some of those claims to go before a jury.

The following exchange then occurred:

THE COURT: So, do you agree that the claim . . . you think survives . . . is solely a hostile work environment claim?

[PLAINTIFF'S COUNSEL]: Hostile work environment based upon gender discrimination.

THE COURT: Right.

[PLAINTIFF'S COUNSEL]: Yes.

After a brief recess, the judge rendered an opinion from the bench, stating,

in part:

In support of my conclusions and the decision that I'm about to render, I'm incorporating comments that were made, not throughout the entire course of the argument, but during [plaintiff's] argument I asked several specific questions about claims that were conceded[,] and a number of the claims are no longer in the case by consent. That is, there are certain claims that were pleaded in the complaint . . . which [plaintiff's counsel] . . . conceded . . . were not surviving.

[I] then went through the factual allegations as to which there was an extensive record put forth in connection with the motions and identified, I think for the most part with plaintiff's counsel agreement, what were . . . either

11

facts conceded by defendants as alleged by plaintiff or facts that the court was going to take as true for purposes of the motion in the light most favorable to plaintiff. And . . . the court did take out a number of the facts that were originally in plaintiff's argument or in plaintiff's pleading that . . . plaintiff had failed to establish that various things of which she was complaining were in any way related to her gender and I believe plaintiff's counsel agreed with that recitation of the facts that remained for purposes of the hostile work environment claim.

And that . . . is the remaining count as to which the court is being asked to decide the dispute, about whether defendants are entitled to summary judgment.

. . . .

To state a claim for hostile work environment, sexual harassment, a female plaintiff must allege conduct that occurred because of her sex and that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating hostile or offensive work environment. It was with that standard in mind that the court went through the facts and eliminated those facts that the plaintiff . . . either has not alleged or has not put forth a prima facie case or didn't respond to a defense rebuttal of a prima facie case as to them being related to her gender and was left with the facts that were already set forth on the record. The question is[,] can the court decide as a matter of law that that conduct was not severe or pervasive enough to make a reasonable woman believe that the conditions of employment are altered and the working environment is hostile or abusive.

The judge concluded that when certain claims were identified as "not established to be gender based" and "were stripped out, it really comes down to far fewer facts in support of the hostile work environment claim than appeared at first." She also stated she was "persuaded that the conduct that plaintiff complains of that . . . could arguably be or . . . is gender based does not rise to the level to create a severe and pervasive environment altering the terms and conditions of her employment." Thus, the judge granted summary judgment on "the only remaining claim," i.e., the hostile work environment claim, and dismissed plaintiff's complaint with prejudice. The judge did not reach the issue of whether any of plaintiff's claims were time barred.

On appeal, plaintiff presents the following arguments for our consideration:

POINT I

SUMMARY JUDGMENT CANNOT BE GRANTED WHERE, AS HERE, THERE ARE GENUINE ISSUES OF MATERIAL FACT (PASSIM).

POINT II

APPELLANT'S CLAIMS ARE NOT SUBJECT TO A STATUTE OF LIMITATIONS AND THE TRIAL COURT PROPERLY DID NOT RULE OTHERWISE.

## POINT III

THE TRIAL COURT IMPROPERLY DISMISSED APPELLANT'S CLAIM FOR HOSTILE WORK ENVIRONMENT (Passim).

A. THE LEGAL FRAMEWORK OF A HOSTILE WORK ENVIRONMENT CLAIM.

B. THE FACTS SUPPORT APPELLANT'S HOSTILE WORK ENVIRONMENT CLAIM.

i. Appellant raised a sufficient dispute of material fact from which a jury could conclude that the harassing conduct would not have occurred but for her gender.

ii. The trial court erred in disregarding facts that a reasonable juror could find support a claim for hostile work environment (PASSIM).

iii. The trial court erred by ignoring the importance of discriminatory and bias behavior evidenced by Appellant's supervisor.

C. THE TRIAL COURT ERRED IN EXCLUSIVELY RELYING UPON DISTINGUISHABLE FEDERAL LAW.

## POINT IV

THE TRIAL COURT ALSO ERRED BY DISMISSING APPELLANT'S DISCRIMINATION CLAIM PREMISED UPON THE NJLAD (NOT RAISED BELOW).

14

A-1802-19

POINT V

BECAUSE APPELLANT'S CLAIMS FOR HOSTILE
WORK ENVIRONMENT AND VIOLATION OF THE
NJLAD SURVIVE SUMMARY JUDGMENT, SO
MUST COMPANION CAUSES OF ACTION
AGAINST RESPONDENT EMPLOYER UNDER
THE DOCTRINES OF RESPONDEAT SUPERIOR
AND VICARIOUS LIABILITY (NOT RAISED
BELOW).

As we are satisfied the argument raised in Point IV lacks merit, R. 2:11-3(e)(1)(E), and was not raised below, we need not address it. Selective Ins. Co. of Am. v. Rothman, 208 N.J. 580, 586 (2012). We also are persuaded that during argument of the summary judgment motion, plaintiff agreed to the dismissal of all counts of her complaint, with the exception of her hostile work environment count, so we limit our discussion to that remaining claim, as referenced in Points I, II, and III, with the understanding that, as to Point V, "an employer whose supervisory employee is acting within the scope of his or her employment will be liable for the supervisor's conduct in creating a hostile work environment." Lehmann v. Toys 'R' Us, 132 N.J. 587, 619 (1993).

"We review de novo the trial court's grant of summary judgment, applying the same standard as the trial court." Abboud v. Nat'l Union Fire Ins., 450 N.J. Super. 400, 406 (App. Div. 2017) (citing Templo Fuente de Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016)). This standard

15                                                          A-1802-19

mandates the grant of summary judgment "if the pleadings, depositions, answers to interrogatories[,] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). In our review, we consider, as we must, facts in the summary judgment record in the light most favorable to plaintiff. Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013). That record includes concessions made by defendants' counsel during argument before us, as well as the trial court. Guided by these standards, we are convinced defendants were not entitled to summary judgment on plaintiff's hostile work environment claim.

"Discrimination based on gender is 'peculiarly repugnant in a society which prides itself on judging each individual by his or her merits.'" Lehmann, 132 N.J. at 600 (quoting Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 96 (1990)). "The LAD specifically prohibits employment discrimination based on sex," providing:

> It shall be [an] unlawful employment practice, or, as the case may be, an unlawful discrimination:
>
> > a. For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, [or] sex . . . of any individual, . . . to refuse to hire or employ or to bar or

16

> to discharge . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions[,] or privileges of employment
>
> . . . .
>
> [Ibid. (ellipses in original)(quoting N.J.S.A. 10:5-12).]

To prove a gender-based hostile work environment claim under the LAD, the plaintiff must "demonstrate that 'the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.'" Griffin v. City of E. Orange, 225 N.J. 400, 413-14 (2016) (emphasis omitted) (quoting Lehmann, 132 N.J. at 603-04). "Thus, the second, third, and fourth prongs are, to some degree, interdependent." Shepherd v. Hunterdon Dev. Ctr., 174 N.J. 1, 24 (2002) (citing Lehmann, 132 N.J. at 604).

> While a plaintiff need not show that his or her employer intended to create a hostile work environment, "[c]ommon sense dictates that there is no LAD violation if the [employer's] conduct would have occurred regardless of the plaintiff's [protected status]." Lehmann, 132 N.J. at 604. Also, regarding the second prong of the Lehmann test, [w]hether conduct is "severe or pervasive" requires an assessment of the totality of the relevant circumstances, . . . which involves examination of (1) "the frequency of all the

discriminatory conduct"; (2) "its severity"; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (4) "whether it unreasonably interferes with an employee's work performance."

[Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 196 (2008) (quoting Green v. Jersey City Bd. of Educ., 177 N.J. 434, 447 (2003)).]

"Severe or pervasive" conduct may be established by proof of "numerous incidents that, if considered individually, would be insufficiently severe to state a claim." Lehmann, 132 N.J. at 607. A proper regard for "the totality of the circumstances" requires consideration of "the cumulative effect of the various incidents," which in some situations "may exceed the sum of the individual episodes." Cutler v. Dorn, 196 N.J. 419, 431 (2008) (citations omitted).

A person's workplace environment is affected not only by conduct directed at that person, "but also by the treatment of others." Lehmann, 132 N.J. at 611. While "a single act of . . . offensive conduct could, under certain conditions, create a hostile work environment," such cases are "rare and extreme." Oakley v. Wianecki, 345 N.J. Super. 194, 202 (App. Div. 2001) (quoting Lehmann, 132 N.J. at 606-07). Therefore, we generally consider "the cumulative effect of the various incidents." Godfrey, 196 N.J. at 196 (quoting Lehmann, 132 N.J. at 607).

Importantly, "when determining whether conduct has created a hostile work environment, the harassing conduct itself must be evaluated, 'not its effect on the plaintiff.'" Id. at 197 (quoting Lehmann, 132 N.J. at 606). Further, the conduct must be assessed "by use of a reasonable-person standard, which was adopted to keep the test for harassing conduct tied to reasonable community standards and yet allow for its evolution as societal norms mature." Ibid. (citing Lehmann, 132 N.J. at 603-04, 612).

Recently, our Supreme Court addressed a hostile work environment claim involving a supervisor who allegedly made two racist comments about Hispanics. Noting the "overarching responsibilities of a supervisor to prevent and put an end to . . . harassment in the workplace," the Court observed:

> the severity of a remark can be "exacerbated" when it is uttered by a supervisor. [Taylor v. Metzger, 152 N.J. 490, 503 (1998)]. Supervisors have an important "role in shaping the work environment." Ibid. They should prevent, not create, a hostile atmosphere. For that reason, invidious harassment by a supervisor can have a greater impact than misconduct by fellow employees. See id. at 504 [citation omitted].
>
> [Rios v. Meda Pharm., Inc., 247 N.J. 1, 11-12 (2021).]

The Legislature has consistently acted to strengthen the LAD to enhance protection for individuals. Rodriguez v. Raymours Furniture Co., Inc., 225 N.J. 343, 357 (2016). Nonetheless, to pursue an LAD claim in Superior Court, a

plaintiff must act in a timely fashion.   As our Supreme Court has instructed, "LAD claims are subject to the two-year statute of limitations set forth in N.J.S.A. 2A:14-2(a)" but "[d]etermining when the limitation period begins to run depends on when the cause of action accrued, which in turn is affected by the type of conduct a plaintiff alleges to have violated the LAD."  Alexander v. Seton Hall Univ., 204 N.J. 219, 228 (2010).

> [D]iscrete acts of discrimination [such as] . . . . [d]iscriminatory termination and other similar abrupt, singular adverse employment actions that are attributable to invidious discrimination . . . generally are immediately known injuries, whose two-year statute of limitations period commences on the day they occur.  [Roa, 200 N.J. at] 569.
>
>  However, when the complained-of conduct constitutes "a series of separate acts that collectively constitute one unlawful employment practice[,]" the entire claim may be timely if filed within two years of "the date on which the last component act occurred."  Id. at 567 (citation and internal quotation marks omitted).  The "continuing violation" doctrine, recognized under federal Title VII law as an appropriate equitable exception to the strict application of a statute of limitations, provided the analytic framework that has been used in the assessment of a LAD hostile workplace environment claim.  See id. at 566-68.
>
> . . . . [I]n Shepherd v. Hunterdon Developmental Center, 174 N.J. 1, (2002), . . . . [w]e turned to the equitable doctrine for assistance in addressing the thorny factual circumstances of an ongoing workplace harassment claim that involved alleged incidents of

20

both discrete and non-discrete acts of discriminatory workplace hostility. Shepherd, 174 N.J. at 21 (citing [Nat'l R.R. Passenger Corp. v.] Morgan, 536 U.S. [101,] 116 [(2002)]). Morgan had clarified the distinction between discrete acts of discrimination and hostile work environment claims, stating that hostile work environment claims by "[t]heir very nature involve[] repeated conduct" of varying types and that "[s]uch claims are based on the cumulative effect of individual acts." Morgan, 536 U.S. at 115. Recognizing the beneficial effect of adopting Morgan's approach to such difficult hostile work environment scenarios where an employee may be subjected to ongoing indignities, we held in Shepherd, that "a victim's knowledge of a claim is insufficient to start the limitations clock so long as the defendant continues the series of non-discrete acts on which the claim as a whole is based." 174 N.J. at 22. . . . .

. . . . However, we warned [in Roa] that "[w]hat the doctrine does not permit is the aggregation of discrete discriminatory acts for the purposes of reviving an untimely act of discrimination that the victim knew or should have known was actionable." [200 N.J. at 569.]

[Id. at 228-30 (emphasis added).]

A key factor in determining whether acts of discrimination were discrete or connected is "permanence," meaning "whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." Mancini v. Twp. of Teaneck, 349 N.J. Super. 527, 557 (App. Div. 2002). In sum, the LAD's limitation period for a hostile

21

work environment claim begins to run from the occurrence of the last act in a pattern that established a unitary "continuing violation" even though none of those acts were separately actionable. Roa, 200 N.J. at 566-68. While only timely claims can have a remedy, "time-barred claims may be evidential in the proceedings" because "N.J.R.E. 404(b) allows evidence of other 'wrongs' to prove 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute.'" Id. at 576.

Mindful of these standards, we note that for purposes of summary judgment, defendants admitted the following acts occurred while plaintiff was employed by the RPPD:

1. Penis drawings were displayed around the Headquarters;

2. A male officer watched a pornographic video in plaintiff's presence while at Headquarters;

3. Male officers, including Chief Flannelly, regularly commented on plaintiff's appearance and hair;

4. Male officers told sexual jokes in plaintiff's presence;

5. Male officers engaged in "dick punching" and called each other a "dick" or "pussy";

22

6. Chief Flannelly told plaintiff she could "come back to work" if she wore "a French maid outfit."

Given our de novo standard of review of a summary judgment ruling, we are not limited in our analysis to only those facts conceded by defense counsel. Instead, we also consider plaintiff's allegations and those of her former dispatcher, Cuocci, who corroborated some of plaintiff's allegations in his deposition testimony. Viewing such acts collectively, juxtaposed with the very recent determination by the Rios Court that a rational factfinder could conclude the alleged utterance of two racial slurs by an employee's supervisor was "sufficiently severe or pervasive to create a hostile work environment," 247 N.J. at 16, we are persuaded plaintiff's hostile work environment claim was entitled to survive summary judgment and proceed to a jury. Indeed, our Supreme Court has confirmed that in hostile work environment cases, whether rude and obnoxious behavior is severe or pervasive enough to be actionable is a jury question, precluding summary judgment. See Cutler, 196 N.J. at 436 (finding that the trial court appropriately recognized that the plaintiff's claims should be decided by the jury).

Unlike a termination or a similar "punitive retaliatory act," the acts to which defendants admitted, coupled with the additional acts alleged by plaintiff,

and corroborated by Cuocci, involved separate incidents, such as those contemplated in <u>Morgan</u>, which by "[t]heir very nature involve[d] repeated conduct" of varying types. 536 U.S. at 115. As discussed, "the cumulative [e]ffect of [these] individual acts" should have been considered when assessing plaintiff's hostile work environment claim. <u>Ibid.</u> Also, given that the litany of plaintiff's allegations span "the course of her employment, from beginning to end [i.e., from August 2003 until December 2015], and even beyond," we are persuaded that for purposes of summary judgment, her cause of action would have accrued on the date on which the last act occurred, and her July 2017 complaint was therefore timely. <u>See</u> <u>Roa,</u> 200 N.J. at 567. <u>See also</u> <u>Alexander</u>, 204 N.J. at 229 ("[W]hen the complained-of conduct constitutes 'a series of separate acts that collectively constitute one unlawful employment practice[,]' the entire claim may be timely if filed within two years of 'the date on which the last component act occurred.'" (alteration in original) (quoting <u>Roa</u>, 200 N.J. at 567)). Moreover, the statute of limitations would not bar plaintiff "from using prior acts as background evidence in support of her timely claim." <u>Ibid.</u> (citing <u>Morgan</u>, 536 U.S. at 113).

Regarding plaintiff's argument in Point III C., we are satisfied her contention is belied by the record, meaning the judge did not rely "exclusively"

on federal law before entering summary judgment.  In fact, the judge referenced Lehmann, as well as another state case when she rendered her decision.  Still, it is worth emphasizing that while our Supreme Court

> has frequently looked to federal precedent governing Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000 to § 2000e-17 . . . . we have "applied the Title VII standards with flexibility" and "have not hesitated to depart" from federal precedent "if a rigid application of its standards is inappropriate under the circumstances."
>
> [Lehmann, 132 N.J. at 600-01.]

Therefore, on remand, we are confident the judge will not hesitate to move beyond federal law, as needed, to promote the broad remedial purpose of the LAD.

Lastly, plaintiff contends the judge mistakenly applied a heightened standard to evaluate plaintiff's hostile work environment claim.  We disagree.  Admittedly, more than once during argument, the judge and counsel referred to plaintiff's burden to meet a "severe and pervasive" threshold to prove her hostile work environment claim.  However, a review of the record in its entirety makes clear the judge fully understood that the second prong of the Lehmann standard calls only for a plaintiff to establish the complained-of conduct was sufficiently "severe or pervasive" to alter the conditions of employment.

A-1802-19

In sum, we affirm the December 3, 2019, dismissal of plaintiff's complaint except as to count one, and reverse the summary judgment ruling regarding that surviving count.

Affirmed in part and reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1802-19